IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

McALLEN DIVISION


| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA | § | CASE NO. 7:20-CR-240-01 |
| | § | McALLEN, TEXAS |
| VERSUS | § | THURSDAY, |
| | § | FEBRUARY 13, 2020 |
| DANIEL SEPULVEDA (1) | § | 10:14 A.M. TO 1:37 P.M. |


DETENTION HEARING


BEFORE THE HONORABLE PETER ORMSBY
UNITED STATES MAGISTRATE JUDGE



APPEARANCES:                          SEE NEXT PAGE

COURTROOM DEPUTY/RECORDER:            DAVID RODRIGUEZ




TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

McALLEN DIVISION

| THE UNITED STATES OF AMERICA | § CASE NOS. 7:20-CR-240-02 |
|---|---|
| | §            7:20-CR-240-03 |
| VERSUS | § McALLEN, TEXAS |
| | § THURSDAY, |
| EVARISTO SEPULVEDA (2) | § FEBRUARY 13, 2020 |
| JUAN INDALECIO GARCIA (3) | § 10:14 A.M. TO 1:37 P.M. |

DETENTION HEARING

BEFORE THE HONORABLE PETER ORMSBY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                           SEE NEXT PAGE

COURTROOM DEPUTY/RECORDER:             DAVID RODRIGUEZ

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:


FOR THE GOVERNMENT:              U.S. ATTORNEY'S OFFICE
                                 Patricia Profit, Esq.
                                 1701 W. Bus. Hwy. 83, Ste. 600
                                 McAllen, Texas  78501
                                 956-618-8010


FOR THE DEFENDANT                Daniel Sanchez, Esq.
DANIEL SEPULVEDA:                Attorney at Law
                                 501 E. Tyler
                                 Harlingen, Texas  78550
                                 956-425-5297


FOR THE DEFENDANT                Gilberto Falcon, Esq.
EVARISTO SEPULVEDA:              Attorney at Law
                                 404 N. Britton Ave.
                                 Rio Grande City, TX  78582
                                 956-437-5836


FOR THE DEFENDANT                Gocha Allen Ramirez, Esq.
JUAN INDALECIO GARCIA:           Attorney at Law
                                 515 E. Second Street
                                 Rio Grande City, TX  78582
                                 956-487-4585


ALSO PRESENT:                    Priscilla Muzzo-Pastor,
                                 Official Court Interpreter

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| CHRISTOPHER DONAHUE | | | | |
| By Ms. Profit | 5 | . | 57 | . |
| By Mr. D. Sanchez | . | 21 | . | 60 |
| By Mr. Falcon | . | 31 | . | 61 |
| By Mr. Ramirez | . | 42 | . | 63 |

| EXHIBITS: | | Marked | Offered | Admitted |
|---|---|---|---|---|

NONE

RULING:

AS TO DEFENDANT
DANIEL SEPULVEDA...............75

AS TO DEFENDANT
EVARISTO SEPULVEDA.............98

AS TO DEFENDANT
JUAN INDALECIO GARCIA.........124

1          McALLEN, TEXAS; THURSDAY, FEBRUARY 13, 2020; 10:14 A.M.

2          (Official Interpreter utilized for translation)

3               THE COURT:  So we'll go ahead and turn back to the

4     case we were proceeding on the other day when the power went

5     out.  Hopefully, it'll stay on here today.  This is Criminal

6     Case No. M-20-240, United States versus Daniel Sepulveda.

7               If you could please come forward and you can just

8     have a seat at counsel table with your attorney as we continue

9     the hearing.  And then also on the same case, Evaristo

10    Sepulveda, III, and Juan Indalecio Garcia.

11              Let's see.  Right.  Just so long as the defendants

12    are sitting next to their attorneys, that's probably fine.

13    Thank you.

14              Okay.  So we're at the point the Government was

15    going to present some evidence.  Ms. Profit?

16              MS. PROFIT:  Yes.  The Government calls Special

17    Agent Christopher Donahue, Your Honor.

18              THE COURT:  Okay.  Come forward, sir.

19         (Witness sworn)

20              DIRECT EXAMINATION OF CHRISTOPHER DONAHUE

21    BY MS. PROFIT:

22    Q    Could you state your name for the Record?

23    A    Christopher Donahue.

24    Q    And where are you employed?

25    A    The Drug Enforcement Administration in McAllen, Texas.

1    Q    And how long have you been with the Drug Enforcement

2    Administration?

3    A    Approximately 4-1/2 years.

4    Q    And has it always been in McAllen, Texas?

5    A    Yes, ma'am.

6    Q    Now are you involved in the investigation of Daniel

7    Sepulveda, Evaristo Sepulveda and Juan Indalecio Garcia?

8    A    I am.

9    Q    And that's part of a larger drug trafficking

10   organization, correct?

11   A    Correct, ma'am.

12   Q    Could you identify for the Record Daniel Sepulveda?

13   A    Daniel Sepulveda is sitting at the defense counsel table.

14   He's wearing a green jacket.

15        MS. PROFIT:  Would the Record reflect he's

16   identified the Defendant Daniel Sepulveda?

17        THE COURT:  Yes, uh-huh.

18   BY MS. PROFIT:

19   Q    Could you identify for the Record Evaristo Sepulveda?

20   A    Evaristo Sepulveda is sitting at defense counsel table.

21   He's wearing a grey colored sweatshirt.

22        MS. PROFIT:  Would the Record reflect he's

23   identified the Defendant Evaristo Sepulveda?

24        THE COURT:  Yes, it will.

25   BY MS. PROFIT:

1    Q    And could you identify the Defendant Juan Indalecio
2    Garcia?
3    A    Yes.  Juan Garcia is sitting at defense counsel table
4    wearing a green colored camouflage sweatshirt.
5         MS. PROFIT:  Would the Record reflect he's
6    identified the Defendant Juan Indalecio Garcia?
7         THE COURT:  Yes, it will.
8    BY MS. PROFIT:
9    Q    Could you explain for purposes of this detention hearing
10   the defendants are charged with smuggling 320 kilograms of
11   cocaine, correct?
12   A    Yes.
13   Q    And could you identify the weight of the evidence as to
14   each of these defendants?  For example, Daniel Sepulveda, what
15   was his role?
16   A    So, Daniel Sepulveda was identified as the driver of the
17   ATV that was transporting the 320 -- approximately 320
18   kilograms of cocaine.
19   Q    And what did he do?  At some point in time did he flee to
20   Mexico?
21   A    Yes.  So, following the failed smuggling attempt agents
22   observed Daniel Sepulveda drive the vehicle back towards the
23   Rio Grande River.  They observed him crash down into the river
24   and then swim back into Mexico.
25   Q    And what was Evaristo Sepulveda's role in this?

1    A    So, Evaristo Sepulveda was observed at 208 Midway Road

2    prior to the agents getting dropped off south of 208 Midway

3    Road.

4    Q    And when you say "the agents" you're talking in terms of

5    Border Patrol agents?

6    A    Yes, the two Border Patrol agents that were involved in

7    the seizure, ma'am.

8         So, Evaristo was observed prior to the smuggling

9    event.  And then immediately after the smuggling event he was

10   observed leaving the residence, getting into a vehicle and

11   then driving to a barn approximately 30 yards away.  And then

12   he was observed with a bag in his hand attempting to feed

13   horses.  That's what he told the Border Patrol agent.

14   Q    Now he was -- he -- in terms of where Evaristo was, was

15   there a bundle of cocaine that was found in close proximity to

16   where Evaristo Sepulveda was?

17   A    Yes.  Where he was standing during the smuggling attempt

18   he was approximately five to ten yards from the bundle of

19   cocaine.  And Juan Garcia was also in the same area, standing

20   right next to Evaristo Sepulveda, approximately five to ten

21   yards from a bundle of cocaine.

22   Q    And if I remember correctly, were these individuals

23   attempting to feed the horses deer corn?  Am I remembering

24   that correctly?

25   A    The Border Patrol agent that encountered both Evaristo

1    Sepulveda and Juan Garcia, he wasn't able to tell what kind of
2    -- what was in the bag.  It just appeared to be a bag of corn.
3    Q    And now, and in terms of these individuals, so in terms
4    of the 320 kilograms of cocaine when we talk in terms of the
5    weight of the evidence we're talking in terms of observations
6    by Border Patrol agents, correct?
7    A    Correct, ma'am.
8    Q    And in addition to that do we have any information from
9    cooperating individuals?
10   A    Yes, ma'am.  So we spoke to multiple sources of
11   information and cooperators that stated that Daniel Sepulveda
12   was involved in the 320 kilograms of cocaine that was seized
13   by Border Patrol agents.
14   Q    And with respect to the other individuals have they also
15   been identified by cooperating individuals?
16   A    Yes.
17   Q    And this is more than one cooperating individual?
18   A    Yes.
19   Q    Now in addition to that we've executed search warrants.
20   Have we retrieved certain information from various phones
21   identified as belonging to these individuals?
22   A    Yes.  So on August 30th, 2019, DEA, U.S. Border Patrol
23   and Texas DPS executed a search warrant at Daniel Sepulveda's
24   residence at 25 Midway Road.  During a search of that
25   residence we recovered one cell phone.  We actually recovered

1   multiple cell phones from Daniel Sepulveda's person.  In one

2   of those phones agents recovered text messages between Daniel

3   Sepulveda and Daniel Sepulveda's wife, Ariana Sepulveda, on

4   January 17th and January 18th, describing the cocaine

5   smuggling attempt.

6   Q    And have we identified -- have we also seized cell phones

7   containing text messages that discuss other cocaine smuggling

8   attempts other than the ones involving -- other than the 320

9   kilograms of cocaine?

10  A    Correct, ma'am.  So in that same phone there were several

11  messages between Daniel Sepulveda and Juan Garcia.  Juan

12  Garcia was identified in the text messages between Daniel

13  Sepulveda and Juan Garcia.  A picture of Juan Garcia is sent

14  in the text message stream, as well as Juan Garcia's address.

15  In those text messages agents identified approximately 10

16  suspected cocaine loads that were crossed across the Rio

17  Grande River and into the Midway Road area, Rio Grande City,

18  Texas.

19  Q    And this would involve Daniel Sepulveda and Juan Garcia?

20  A    Yes, ma'am.

21  Q    Now in addition to these cocaine smuggling attempts that

22  are detailed in the cell phone records and the text messages,

23  in addition to that do we have any linkages to them to the

24  seizure of $1,487,005 at 32 Midway Road?

25  A    Yes.  So on July 2nd, 2019, U.S. Border Patrol agents and

1    Texas DPS troopers seized $1,487,005 from the river bank area

2    on the Rio Grande River.  Daniel Sepulveda and Evaristo

3    Sepulveda's cousin, Manuel Sepulveda, was subsequently

4    arrested in that bulk currency smuggling attempt.

5             Prior to, during and afterwards the smuggling

6    attempt agents observed an unusual amount of activity at the

7    parents' residence of Daniel and Evaristo Sepulveda.  Because

8    of the amount of activity that was observed at this residence

9    agents subsequently did a consensual encounter at the

10   residence and encountered Daniel Sepulveda and Evaristo

11   Sepulveda at that residence.

12   Q    Now when we -- a search warrant was conducted at Daniel

13   Sepulveda's residence on August 30 of 2019.  How much cash was

14   seized from that residence at that time?

15   A    I believe it was a little bit more than $83,000.

16   Q    And was there anything significant about the packaging of

17   that?

18   A    Yeah, the majority of the money was wrapped in Saran

19   wrap.  It was packaged like bulk drug proceeds and was hidden

20   in a drawer.  Another large amount of money was in a backpack

21   and it was bundled with rubber bands.

22   Q    Now at that time did Daniel Sepulveda make any remarks

23   with respect to pole cameras?

24   A    Yes.  Towards the end of the search warrant when I was

25   going over the items seized from the residence in front of him

1   and his brother, Daniel Sepulveda made several remarks about

2   pole cameras that were located on Midway Road.  Daniel

3   Sepulveda stated that he wanted agents to take the cameras

4   down.  He stated that he knew they were DEA cameras because he

5   spoke to someone at the electric company and they told him

6   that they were specifically DEA cameras.  And then his brother

7   stated that it was against their Constitutional rights to have

8   law enforcement cameras on Midway Road in the area of their

9   houses.

10  Q    And did anything subsequently happen to that -- those

11  pole cameras?

12  A    Yes.  On that same evening our pole cameras were shot out

13  and rendered inoperable.

14  Q    And prior to their being rendered inoperable was there

15  any observations with respect to Daniel Sepulveda?

16  A    Yes.  Agents conducted surveillance at Jose Luis's

17  secondary residence at 39 Allegria Circle.  They observed Jose

18  Luis Garcia show up to that residence.  They observed Daniel

19  Sepulveda and Rene Sepulveda show up to that residence.

20  Shortly after they observed Jose Luis Garcia exit the

21  residence with a rifle case.  The same rifle case was observed

22  on that same day during a search warrant at that residence,

23  containing a fire arm.  They observed Jose Luis Garcia get

24  into his vehicle with the rifle case.  They observed everybody

25  leave the residence, including Daniel Sepulveda and Rene

1    Sepulveda.  Approximately one hour later our pole cameras were
2    rendered inoperable.
3    Q    And when you say that they were rendered inoperable, have
4    the pole cameras subsequently been examined and a
5    determination made as to why they were inoperable?
6    A    Yes.  So it was a pole camera located on a pole, electric
7    pole maybe approximately 100 yards from Daniel Sepulveda and
8    Evaristo Sepulveda's residence.  Texas DPS Rangers went out
9    following the pole cameras being shot.  They conducted a
10   trajectory investigation and determined that that one specific
11   camera was shot from 32 Midway Road, which is the residence of
12   Daniel Sepulveda and Evaristo Sepulveda's parents' house.
13   Q    And what about were they able to make any determination
14   with respect to the other pole camera?
15   A    I don't have that information with me, ma'am.
16   Q    Okay.  So in addition to that does Daniel Sepulveda have
17   any *corridos*?
18   A    Yes.  During a search of Daniel Sepulveda's phone agents
19   discovered two phones or two songs that appeared to be written
20   about Daniel Sepulveda and narco trafficking.  Narcotics
21   trafficking.
22   Q    And when you say "narco trafficking" could you explain
23   please what the purpose of a *corrido* is?
24   A    Well, in drug trafficking songs are, especially with
25   Mexican drug cartels, the drug traffickers like to have songs

1    written about them.

2    Q    And is the purpose of these songs to sort of celebrate

3    how great they are in terms of their drug trafficking?

4    A    Yes.  Usually songs describe violence, they describe

5    kidnappings, they describe successful narcotics smuggling

6    attempts, they describe a lot of currency that they make

7    regarding their narcotics trafficking.

8    Q    Now in terms of Daniel Sepulveda's *corridos* did he

9    identify any individuals that are investigating him in his

10   *corridos*?

11   A    Yes, my partners listened to the songs and they

12   identified several events that appear to be depicting Daniel

13   Sepulveda and U.S. Border Patrol.

14   Q    And any specific U.S. Border Patrol individuals?

15   A    Yes.  One individual, they describe white law enforcement

16   officers.

17   Q    Okay.  Now in addition to that during -- when Daniel

18   Sepulveda was arrested did he make any threats or make any

19   statements with respect to law enforcement?

20   A    Yes.  So when Daniel Sepulveda was being transferred or

21   transported from the area of his residence after he was

22   arrested to the DEA office he made a statement stating that "I

23   have ten guys over that hill."  So the agents related to me

24   that they believed that he was insinuating that he had other

25   people that could possibly stop law enforcement from

1    transporting him.

2    Q    Did he make any other statements with respect to when you

3    made entrance into his property, what he thought he would have

4    been able to do?

5    A    Yes.  So at the DEA office in McAllen he made a statement

6    saying that agents were lucky, that if he got one of his

7    rifles he would have at least shot two agents.  He stated that

8    he wasn't afraid to die and he would have at least killed two

9    agents.

10   Q    Now did he also brag to the agents with respect to how

11   many vehicles he had or how he attempts to evade law

12   enforcement?

13   A    Yes.  Daniel Sepulveda stated to my partners that he had

14   access to approximately 40 vehicles on a daily basis.  He

15   stated that he utilizes at least five different vehicles or

16   more on a daily basis in order to avoid law enforcement

17   detection.

18   Q    And is this something, these bragging statements that

19   he's made or these statements that he's made at the time, is

20   that something consistent that law enforcement has observed?

21   A    That's correct, ma'am.

22   Q    And when you say you observed it, you've observed him

23   using more than one vehicle, correct?

24   A    Yes.  Daniel Sepulveda frequently changes out vehicles.

25   Q    Now in terms of Evaristo Sepulveda what did agents find

1    in terms of narcotics when they executed the search warrant at

2    his residence on February 5th, 2020?

3    A    So when agents executed the search warrant at Evaristo's

4    residence they located and seized approximately 200 grams of

5    marijuana. It was packaged like street level distribution

6    amounts.  They also seized approximately 40 grams of cocaine.

7    And next to the cocaine and marijuana was a handgun.

8    Q    And were these -- was the cocaine, the handgun, etcetera,

9    the street level distribution, was this found in the laundry

10   room of the house?

11   A    Correct, ma'am.

12   Q    Now, and was he also, in terms of some of the information

13   in terms of his phone, what did his phone show in terms of

14   pictures in terms of narcotic trafficking?

15   A    So he had a lot of pictures in his phone with smaller

16   amounts of marijuana.  And then he also had numerous pictures

17   regarding marijuana bundles that were kind of -- you could

18   tell it was marijuana.  So it was bulk quantities of

19   marijuana.

20        A few days prior to him getting arrested there was a

21   photo in his phone of a kilogram of cocaine.  And Evaristo

22   Sepulveda and another subject, they're talking about the

23   purchase of that particular kilogram of cocaine.

24        He also had one particular video that was drug --

25   that appears to be a drug cartel interrogation video.  In that

1    video the subject was getting his legs cut off.  He was alive

2    and getting his legs cut off.  And then he was getting beat

3    with his own legs.

4            And then in another video it appears that a deceased

5    subject is removed from the bed of a truck.  Then two

6    individuals then picked this person from the truck and dumped

7    him, looks like, in the landfill.

8    Q    Now in terms of his phone did you find any pictures of

9    law enforcement?

10   A    Yes.  He had numerous videos of law enforcement

11   helicopters flying in the air.  He had numerous videos of law

12   enforcement traffic stops.  And he had numerous pictures of

13   looks like him pulled on the side of the road taking pictures

14   of law enforcement or taking pictures down the street that in

15   my experience appears to be pictures of him scouting for law

16   enforcement.

17   Q    Now in terms of Juan Indalecio Garcia, the information

18   with respect to him is that he -- how frequently does he -- At

19   one point in time you interviewed an individual by the --

20   Amerigo Garcia on January 18th, 2019, correct?

21   A    Yes.  So following the seizure of the 320 kilograms of

22   cocaine on January 17th, the following day myself and my

23   partners went down to 208 Midway Road, which is the residence

24   of Juan Garcia's father, Amerigo Garcia.  I spoke to Amerigo

25   Garcia that day.  He was very cooperative and respectful.

1    During the interview with Amerigo Garcia he stated that he did

2    not know what Juan Garcia did for work.  He also stated he

3    didn't know where his son lived or he didn't know what his

4    phone number was.

5    Q    And you considered that to be strange considering that

6    he's his father, correct?

7    A    Yeah, I found it very strange because he's down on his

8    property a lot.

9    Q    And in addition, so now -- And what other kinds of

10   criminal activity do we have him associated with?  Juan

11   Indalecio Garcia?

12   A    So Juan Garcia, so when we seized Daniel Sepulveda's

13   phone on August 30th agents discovered approximately --

14   numerous conversations between Daniel Sepulveda and Juan

15   Garcia discussing narcotics that was crossing the Rio Grande

16   River.  Agents determined between approximately June and

17   August 2019 they crossed approximately 10 cocaine loads.

18   Additionally, agents have observed Juan Garcia in and around

19   the area of 208 Midway Road on numerous occasions and they

20   also observed him involved in suspected smuggling attempts.

21           In June of 2018 agents observed an ATV travel

22   from 208 Midway Road and travel to the river and it

23   subsequently traveled back.  So agents felt like that was a

24   smuggling attempt so agent responded.  This particular Border

25   Patrol agent encountered Juan Garcia at the residence, as well

1    as two other individuals.  On this date Juan Garcia was really

2    uncooperative.

3              Agents discovered two ATVs next to the house in

4    close proximity to where Juan Garcia was standing.  Agents

5    observed I guess footprints next to one of the ATVs.  They

6    followed the footprints to a barn approximately 30 to 40 yards

7    away from the house.  Inside the barn they found five

8    individuals that were determined to be illegal aliens.  In the

9    brush line close to the barn they found -- apprehended another

10   two individuals that were also determined to be illegal

11   aliens.  The seven subjects indicated that -- stated to agents

12   that they were picked up and transported from the river into

13   the United States and taken to the house.  However, they could

14   not at the time identify the ATV that transported them or the

15   subjects at the house.

16   Q    Now in terms of individuals involved in this narcotics

17   trafficking organization is there an individual that the

18   Government at one time had an arrest warrant for and they were

19   attempting to find and have been unable to find?  An

20   individual by the name of Joaquin Sepulveda?

21   A    That's correct, ma'am.

22   Q    And what have we subsequently learned or is there an

23   ongoing investigation into the disappearance of Joaquin

24   Sepulveda?

25   A    Yes.  So Joaquin Sepulveda was involved in an illegal

1    alien smuggling attempt in July of 2019.  The vehicle that
2    Juan Garcia was driving during that attempt was a Toyota
3    Tacoma and that same Toyota Tacoma was present at 208 Midway
4    Road on the 320 kilograms of cocaine that was at the house.
5    Following Joaquin Sepulveda there was a vehicle chase.  Agents
6    tried to -- attempted to stop him.  Joaquin Sepulveda
7    subsequently splashed down into the river, swam back into
8    Mexico.  Agents, Border Patrol agents arrested two illegal
9    aliens.
10            Shortly after that an arrest warrant was issued for
11   Joaquin Sepulveda for transportation of illegal aliens.  Since
12   then agents have not been able to find him.  However, since
13   this smuggling event in July the agents have interviewed
14   numerous sources that stated that Juan Garcia and Daniel
15   Sepulveda were involved in the disappearance of Joaquin
16   Sepulveda.
17   Q    Now the disappearance of Joaquin Sepulveda is considered
18   unusual because he has a young child, correct?
19   A    Correct.
20   Q    And how old would that child be?
21   A    I believe now his young child would be maybe five or six
22   months old.
23            MS. PROFIT:  I have no further questions of this
24   agent.
25            THE COURT:  Okay.  And let me see.  I guess

1    beginning with Mr. Sanchez.  Did you wish to ask any

2    questions, sir?

3               MR. S. SANCHEZ:  Yes, Your Honor, if I may.

4               THE COURT:  Okay.  And if you'd please pull the

5    microphone a little bit closer, Mr. Sanchez.

6               CROSS-EXAMINATION OF CHRISTOPHER DONAHUE

7    BY MR. D. SANCHEZ:

8    Q    Officer Donahue, my name is Dan Sanchez.  I'm going to be

9    asking you some questions.  If you don't understand my

10   question, please let me know and I'll try to clarify it for

11   you.  Okay?

12   A    Understood.

13   Q    How long have you been investigating my client Daniel

14   Sepulveda?

15   A    Daniel Sepulveda I believe popped up in my investigation

16   -- my investigation was going on for approximately three

17   years.  I would say I began getting information on Daniel

18   Sepulveda approximately maybe two years ago, 2-1/2 years ago.

19   Q    So for 2-1/2 years you've known who Daniel Sepulveda is,

20   correct?

21   A    Correct.

22   Q    And the event where the 320 kilograms of cocaine were

23   seized, what day was that?

24   A    It was January 17th, 2019.

25   Q    Over a year ago?  Is that correct?

1    A    Yes.

2    Q    Okay.  And you're saying that on that day you identified

3    my client as the driver of the ATV?

4    A    Yes, your client was identified as the driver of the ATV.

5    Q    Okay.  And at that time you knew who he was?

6    A    I don't understand the question.

7    Q    At the time that he was identified as the driver, you

8    knew who Daniel Sepulveda was?

9         MS. PROFIT:  Your Honor, I'm going to object to this

10   line of questioning as being argumentative.

11        THE COURT:  Well, I think he did already answer

12   that, Mr. Sanchez.

13        But you can go ahead and answer if you know, agent.

14        THE WITNESS:  Yes.  Well, I knew who he was.

15        MR. D. SANCHEZ:  Okay.

16   BY D. SANCHEZ:

17   Q    And at that time you said he escaped to Mexico?

18   A    Yes.  Following the cocaine smuggling event, yes, he swam

19   back to Mexico.

20   Q    Okay.  When was the next time after that that you

21   encountered Daniel Sepulveda?

22   A    The next time I encountered him was probably about

23   May 2019.

24   Q    And on May of 2019 did you decide to arrest him for that

25   smuggling that he had done in January of 2019?

1           MS. PROFIT:  Your Honor, I'm going to object to this

2    line of questioning.  It really has no relevance to --

3           THE COURT:  Well, I understand the point he's

4    making, Ms. Profit.  And I'm just going to go ahead and allow

5    him to ask some further questions on this.

6           But I get the point you're making, Mr. Sanchez.  You

7    don't need to belabor it that there's this information and

8    they waited until now to, you know, arrest your client.  So I

9    understand.  And you can argue that as well without, you know,

10   asking questions that if that's just the point you're getting

11   to.  So, but that's fine.

12          I've forgotten what the last question is.  You can

13   go ahead with that last question, Mr. Sanchez.

14   BY D. SANCHEZ:

15   Q   So just to clarify, there's been several points in time

16   that you've been able to since the arrest and to the time that

17   he actually was arrested for this that you could have arrested

18   him throughout the last year, correct?

19   A   No.  So, that's not correct.  It wasn't until after we

20   started doing extensive surveillance along Midway Road and in

21   the area of 208 Midway Road that through the -- through the

22   partnership with U.S. Border Patrol, Texas DPS, the DEA, HSI

23   and other agencies that were helping us we were able to

24   identify the individuals that were involved in the majority of

25   the smuggling activity in this area.  So over several months

1    we identified I guess you could say the players in this

2    particular area.  So sometime within the last four or five

3    months we showed the Border Patrol agents that were involved

4    in that seizure, we showed them pictures.  And the Border

5    Patrol agent that was involved in the cocaine seizure

6    identified Daniel Sepulveda as the driver of the ATV that

7    crashed in the river.  He actually observed Daniel Sepulveda

8    on three different occasions.

9    Q    Now you talked about a million dollars that was seized

10   back in July of 2019.

11   A    Correct.

12   Q    Do you have any evidence to say that my client was ever

13   in possession or had any control over that million dollars?

14   A    So prior to that bulk currency smuggling event, the

15   vehicle that was involved in that smuggling event stopped at

16   32 Midway Road, which is the residence of Daniel Sepulveda and

17   Evaristo Sepulveda's parents.

18   Q    And that vehicle belonged to who?

19   A    Manuel Sepulveda, which is a cousin of Daniel Sepulveda

20   and Evaristo Sepulveda.

21   Q    And that's the one that has a warrant for him but you

22   can't locate him?

23   A    No, that's a different individual.

24   Q    Okay.  So Manuel Sepulveda was arrested for -- or charged

25   for the possession or I guess money laundering of the over a

1    million dollars?

2    A    Yes, he was arrested on that day for bulk cash smuggling.

3    Q    Okay.  My client wasn't charged with that.

4    A    No.

5    Q    Okay.  And the only links that you're saying he has is

6    that that truck stopped at my client's parents' home?

7    A    Yes.  It stopped at that house, and following the bulk

8    currency smuggling event we did a consent search of that

9    residence.  And inside that residence the agents recovered

10   approximately 17 portable radios that are frequently used in

11   narcotics trafficking and also seized wrapping material.

12   Q    In addition to that you talked about another individual,

13   Joaquin Sepulveda, correct?

14   A    Correct.

15   Q    And he's someone who's related to my client?

16   A    I believe so.  They're cousins.

17   Q    Okay.  And you're saying that my client was involved in

18   his disappearance?

19   A    Yes.  Through interviews with multiple cooperating

20   defendants, source of information that -- whose information

21   has been proven reliable in numerous instances.  Those

22   individuals stated that your client, Daniel Sepulveda, was

23   involved in the kidnapping of Joaquin Sepulveda in Mexico and

24   then was involved in the murder of Joaquin Sepulveda.

25   Q    But this is the same Joaquin Sepulveda who has criminal

1    charges pending against him?

2    A    Yes, he has an outstanding federal arrest warrant for the

3    transportation of illegal aliens and then he also has an

4    outstanding Texas state warrant for probation violation.

5    Q    So he's a fugitive from the law?

6    A    Correct.

7    Q    And because he's got a six-month old child here in the

8    U.S., that seems odd that he would run to Mexico or run away

9    and not show up?

10   A    Well, we have information that he was here during the

11   birth of his child, but he hasn't been seen since.

12   Q    Okay.  But Ms. Profit asked you that it wouldn't be

13   reasonable for someone who has a young child to flee and not

14   come back, correct?

15   A    Well, I feel that's really odd.

16   Q    In other words, if someone has family and ties here --

17            MS. PROFIT:  Asked and answered.  Argumentative.

18   BY D. SANCHEZ:

19   Q    -- it's not likely that they would run, correct?

20   A    Well, yeah, I think people will run.  Yes.

21   Q    So wouldn't it make sense then that Joaquin Sepulveda is

22   running from his charges that he has pending because he's a

23   fugitive?

24   A    No, that could make sense, but through conversations with

25   numerous sources of information and cooperating defendants

1    they say that he was purposely being held over in Mexico and

2    then was subsequently murdered because members of the Garcia

3    and Sepulveda families thought he was going to cooperate with

4    law enforcement.

5    Q    And these same people are cooperating with the Government

6    knowing that the reason this person was killed or allegedly

7    killed was because they cooperated?

8    A    I don't understand your question.

9    Q    Well, you're wanting this Court to believe that you have

10   sources, individuals that are cooperating and have given you

11   information that Joaquin Sepulveda was killed for fear of

12   cooperation.

13   A    That's correct.

14   Q    So these individuals don't have that fear, but Joaquin

15   did?

16             MS. PROFIT:  Your Honor, this is asking him to

17   speculate.  It's also argumentative.

18             THE COURT:  Right.  There is no way he could know

19   that.  I mean he's -- you can argue those things, Mr. Sanchez.

20   Also, that if you want to argue that what he's saying doesn't

21   make sense.  But to ask him questions like that doesn't really

22   help and –

23             MR. D. SANCHEZ:  Yes, Your Honor.  I'll move along.

24   BY D. SANCHEZ:

25   Q    The 40 vehicles that you said my clients used, what are

1  they?  What are the makes, models, what type of vehicles is he

2  using?

3  A    Well, your client, Daniel Sepulveda, told agents he had

4  access to 40 vehicles.  Personally I don't know if he has 40

5  vehicles or not.

6  Q    Okay.  Well, you testified that he has many vehicles,

7  different vehicles he uses.  Can you tell me what they are,

8  the ones that you're aware of?

9  A    No, he has numerous vehicles.

10  Q    Which ones are they, the ones that you know of?

11  A    Well, I don't know particular makes and models off the

12  top of my head.  But I know talking to numerous Border Patrol

13  agents that are constantly out there in the area of his

14  residence that he frequently changes his vehicles.

15  Q    But you don't know what vehicles?

16  A    Not the top off of my head [sic].

17  Q    Okay.  And have any of those vehicles, they've actually

18  been observed by these law enforcement, correct?

19  A    Yes.

20  Q    Your agents?

21  A    My -- yeah.  My partners have observed Daniel Sepulveda

22  driving different vehicles, yes.

23  Q    Okay.  And have you-all run the license plate of those

24  vehicles to see who they belong to?

25  A    I'm sure the agents did.

1    Q    And who do they belong to?

2    A    Sometimes they involve -- Daniel Sepulveda has a lot of

3    vehicles registered to other people.

4    Q    Who are they registered to?

5    A    I don't know off the top of my head.

6    Q    Okay.  Do you know what vehicles --

7         MS. PROFIT:  Your Honor, are we getting into

8    discovery?  This is a detention hearing.

9         THE COURT:  You asked questions, Ms. Profit.

10   Defense counsel can ask questions also and I think we're okay.

11        You can go ahead and continue, Mr. Sanchez.

12        MR. D. SANCHEZ:  Thank you, Your Honor.

13   BY D. SANCHEZ:

14   Q    The *corridos* that you said were written for Mr. Daniel

15   Sepulveda, my client, do you -- did you hear them yourself and

16   understand them?

17   A    I heard them, but I'm not fluent in Spanish, so I didn't

18   understand everything that was in the one video.

19   Q    And do you have anyone that has any first-hand knowledge

20   that those actually were written for him?

21   A    Well, the video was sent to him and it refers to him.

22   And in my investigation I identified that one of his nicknames

23   is La Nina and the one video was called La Guera de La Nina,

24   which is, in my understanding, in Spanish it's the white man

25   and the little girl.

1    Q    So they don't actually identify him by name in these

2    songs?

3    A    I don't believe so.

4    Q    And whoever has heard them is surmising that they're

5    about him?

6              MS. PROFIT:  Your Honor, again I'm going to object

7    that this is argumentative.

8              THE COURT:  I'm going to allow that question.  I

9    don't think it's argumentative.

10             You can answer if you know, Special Agent Donahue.

11             THE WITNESS:  Yes.  My partners that listened to the

12   songs believe they're about Daniel Sepulveda.

13   BY D. SANCHEZ:

14   Q    Okay.  The 10 individuals that you mentioned that were

15   over a hill, were they ever identified?

16   A    No.  I don't believe they existed.  This is what your

17   client told my partners while they were transporting him.

18   Q    Okay.  And the -- Several weapons were found in my

19   client's home, correct?

20   A    That's correct.

21   Q    Were you aware that he is licensed to carry weapons by

22   the State of Texas?

23   A    No, I'm not.

24   Q    You didn't identify his license to carry at all?

25   A    I didn't see that.

1    Q    Okay.  But if he were licensed it would make sense that

2    he'd have several weapons, correct?

3    A    That's correct.

4            MR. D. SANCHEZ:  Pass the witness, Your Honor.

5            THE COURT:  Okay.  Thank you.

6            And, Mr. Falcon, as to your client?

7            MR. FALCON:  Yes, Your Honor.

8            THE COURT:  And again, if you could please move that

9    microphone over, Mr. Falcon.

10            MR. FALCON:  Yes, Your Honor.

11            May I proceed, Your Honor?

12            THE COURT:  Yes, sir.

13            MR. FALCON:  Thank you.

14             CROSS-EXAMINATION OF CHRISTOPHER DONAHUE

15    BY MR. FALCON:

16    Q    Good morning, agent.

17    A    Good morning, sir.

18    Q    I represent Mr. Evaristo Sepulveda.

19            And so we've been talking about 320 kilos, correct?

20    A    That's correct, sir.

21    Q    Okay.  And you just started talking about the 320 kilos

22    that were seized, but I want to go back and I want to -- I

23    want for you to tell us what exactly happened on that day.

24    When did you first learn that there was 320 kilos being

25    smuggled?

1            MS. PROFIT:  Your Honor, for purposes of --

2            THE COURT:  Right.  So I don't think we're going to

3     go into that much detail, Mr. Falcon, just because we could be

4     here for, you know, probably a couple of weeks if we went into

5     all the aspects of the investigation.  It sounds like this

6     lasted, you know -- different aspects lasted over the course

7     of years.  And, you know, for purposes of bond hearing it's

8     really not appropriate to go into, you know, discovery.  But

9     if you want to ask questions that are related to your client's

10    alleged involvement with that, and you can certainly ask

11    specifics about that.  But just asking him to go through the

12    entire thing, you know, point by point...

13           MR. FALCON:  Not the entire thing, Your Honor.  I'm

14    just trying to find out exactly what happened because he

15    testified that there were 320 kilos that were transported in

16    an ATV that was allegedly being driven by Mr. Daniel

17    Sepulveda.  And I want to find out exactly what happened with

18    my client, how was he involved.

19           THE COURT:  Okay.  If you ask that, Mr. Falcon,

20    that's fine.  But the question you asked was much broader than

21    that and would have required to him to like go back into the

22    beginnings of the investigation and each step leading up to

23    that, which is --

24           MR. FALCON:  I'll make the questions more specific,

25    Your Honor.

1          THE COURT:  Yes, sir.

2          MS. PROFIT:  Your Honor, for purposes of the

3     detention hearing the issue is the weight of the evidence

4     against the individual.

5          THE COURT:  Right.

6          MS. PROFIT:  So I think that we should not be too

7     far-reaching in getting into discovery and other areas.  I

8     mean I think that they're attempting to sort of try this case

9     before the Magistrate Court.

10         THE COURT:  Well, I just said that he can't do that.

11    But by the same token on direct Special Agent Donahue

12    testified about that event and implicated Mr. Falcon's client.

13    So, certainly Mr. Falcon can ask specific questions about that

14    same event.

15         So you can go ahead.

16         MR. FALCON:  Thank you.  Okay.  May I proceed?

17         THE COURT:  Yes, sir.

18         MR. FALCON:  Thank you.

19    BY MR. FALCON:

20    Q    Okay.  So 320 kilos seized on what date?

21    A    January 17th, 2019.

22    Q    Okay.  And it's my understanding that this 320 kilos were

23    being transported and ended up at the river bank, or --

24    A    Yes.  So the 320 kilos of cocaine was in 11 bundles,

25    okay, 11 large bundles in burlap sacks.  So 10 of those

1   bundles were found either in the river or on the river bank

2   right where the ATV crashed into the river.  One of those

3   bundles, the 11th bundle, was found approximately five yards

4   from the house, five to ten yards from Amerigo Garcia's house

5   at 208 Midway Road, okay.  That bundle was found approximately

6   five to ten yards from where your client, Evaristo Sepulveda

7   and Juan Garcia were standing during the smuggling event.

8   Q    Okay.  And was that found on a road or was that found

9   just in the brush or where was that found?

10  A    The bundle was five yards from the house.  It's like an

11  open area.

12  Q    Okay.  All right.  And do you have any evidence to

13  indicate that my client had any dealing with that specific

14  bundle?

15  A    Yes, he was standing five to ten yards from the bundle in

16  an open area.  Then when agents responded he fled from the

17  residence in a vehicle and drove maybe 30 yards away to a

18  barn.  The agent that encountered him said he was frantic.

19  Him and Juan Garcia were trying to figure out something to do.

20  So he had a bag of corn in his hand and they were -- he stated

21  he believed they were pretending to feed the stabled horse

22  they observed in the barn at the time.  He said they were

23  really nervous.  They were dressed really nice and in his

24  experience they were not dressed like someone that was

25  ranching or was going to feed horses all day or tend to

1    animals.

2    Q    And when you say the two were dressed you would agree

3    with me also that they were not dressed in a way that would

4    indicate that they were ranching; is that what you're saying?

5    A    According to the agent, yes.

6    Q    Okay.  Now did anybody see my client handling the bundle

7    of cocaine that you just mentioned?

8    A    Not that I know of.

9    Q    Okay.  Now you mentioned that Mr. Daniel Sepulveda was

10   identified as being the driver of the ATV, correct?

11   A    Correct.

12   Q    Okay.  Now from the evidence that you gather, what is the

13   role that you allege that my client had on this particular

14   date?

15   A    Your client was going to receive the cocaine at the

16   house.

17   Q    Okay.  And how do you know this?

18   A    Well, so the agent that encountered Everisto Sepulveda

19   has encountered him on previous occasions, okay, and then your

20   client, Evaristo Sepulveda was also arrested by Border Patrol

21   in June of 2017 for transporting one illegal alien.

22   Q    Okay.  Now, and I asked you this, do you have a

23   confidential informant that indicated to you that my client

24   was specifically going to wait for the cocaine at this

25   particular location, or that's just your conclusion?

1    A    No, we don't have a confidential informant saying that he
2    was there to receive the cocaine.
3    Q    Okay.  And do you have any text messages or any
4    electronic data that indicates that he was going to receive
5    the cocaine?
6    A    Not that I've observed so far.
7    Q    Okay.  Now on the particular day that the cocaine was
8    seized was there any cell phones retrieved from my client?
9    A    No.
10   Q    Okay.  Were there any cell phones that were seized from
11   any of the other individuals that you encountered on that day?
12   A    No.
13   Q    Okay.  Now eventually you seized some phones and it's
14   your allegation that there were some conversations between
15   Daniel and Juan Garcia dealing with cocaine; is that correct?
16   A    Correct.
17   Q    Okay.  Now is there any conversation in that phone that
18   involves my client with the 320 kilos of cocaine?
19   A    I'm not sure.  There's thousands of conversations in that
20   phone.  A lot of them are audio messages and it takes a long
21   time to go through them.
22   Q    But as of right now you cannot definitely tell this Court
23   that there is a conversation that deals with my client and at
24   the same time deals with the 320 kilos, correct?
25   A    I cannot.

1    Q    Okay.  Thank you.

2          Now there's also -- you gave some testimony earlier

3    about $1.4 million that were seized, correct?

4    A    Correct.

5    Q    Okay.  And this was also at the river banks?

6    A    Correct.

7    Q    Okay.  Now what do you claim is my client's role with

8    that $1.4 million?

9    A    According to the source of information your client was

10   scouting from 32 Midway Road for that particular bulk currency

11   smuggling attempt.

12   Q    Okay.  And on the day of the seizure was my client ever

13   seen dealing with the 1.4, transporting it, doing anything

14   with the 1.4 million?

15   A    He was not, but 32 Midway Road has been identified as a

16   scouting location during smuggling events along Midway Road.

17   Q    Okay.  And it is through one source of information that

18   you conclude that my client was scouting?

19   A    Correct.

20   Q    Okay.  And was my client detained on that occasion?

21   A    Yes, he was encountered and detained on that occasion on

22   that day at 32 Midway Road.

23   Q    Okay.  And did he give any statements incriminating

24   himself with the 1.4 million?

25   A    Not that I know of.  According to my partners that were

1    at that location he was pretty uncooperative at that point.

2    Q    Okay.  So he never admitted participation in the 1.4

3    million transaction, correct?

4    A    I do not know.

5    Q    Okay.  Now you testified that throughout the course of

6    your investigation there was some money that was seized from

7    Daniel's home; is that correct?

8    A    Correct.

9    Q    Okay.  Did you seize any large amounts of money from Mr.

10   Evaristo Sepulveda's home?

11   A    We did not.

12   Q    Okay.  And you testified that what was seized was about

13   40 grams of cocaine and how much marijuana, sir?

14   A    It was about -- I think it was approximately 200 grams.

15   Q    Now also I believe that you testified that there was

16   another cell phone, and I can't remember which one, but there

17   was a cell phone that had about ten conversations or ten

18   transactions dealing with cocaine, correct?

19   A    Correct.

20   Q    And within those conversations is there any conversation

21   that involves my client dealing with those transactions?

22   A    I don't know.

23   Q    Okay.  You also talked about some songs that were made

24   about one of the Sepulvedas, correct?

25   A    Correct.

1    Q    And but you would agree with me that there's no songs

2    dealing about my client, right?

3    A    I do not know that.

4    Q    Okay.  Now in your opinion what was my client's role

5    dealing with the 320 kilos?

6    A    I believe he was going to receive that cocaine and then

7    transport it to another location.

8    Q    Okay.  And that was based on your conclusion, correct?

9         MS. PROFIT:  Your Honor, this has been asked and

10   answered.

11        THE COURT:  Right.  I think that one was asked.

12        MR. FALCON:  I'll move on, Your Honor.  I'll move

13   on.

14   BY MR. FALCON:

15   Q    Now I believe also that there was some testimony that

16   some of the agents were threatened by some of the co-

17   defendants?

18   A    That's correct.

19   Q    Okay.  But you would agree with me that my client never

20   made any of those threats, correct?

21   A    No, I spoke to your client on that day and he was

22   cooperative.

23   Q    Okay.  And as far as you're concerned my client has not

24   made any threats to any agents or to anybody, correct?

25   A    No, on that day I talked to him.  He was respectful.

1    Q    Okay.  All right.

2          On the day that my client was arrested for this case

3    did you seize a cell phone from him?

4    A    Yes, several cell phones were seized from the residence.

5    Q    Okay.  And I believe that you testified that there were

6    some videos there dealing with some -- some cartel videos.  I

7    think that's what you mentioned.

8    A    That's correct.

9    Q    Okay.  But there's nothing there that indicates that my

10   client participated in those videos, correct?

11   A    Not that I found yet.

12   Q    Okay.  And in that particular cell phone did you find any

13   conversations that incriminated my client with the 320 kilos?

14   A    I haven't found any conversations about that yet.

15   Q    Were any of the -- any of the bundles, the 10, 11 bundles

16   of cocaine that were seized, were any of those tested for

17   fingerprints or anything like that?

18   A    No.

19   Q    Okay.  And you mentioned that there was a disappearance

20   of an individual and I think his name was Joaquin.  Do you

21   have any evidence that indicates that my client was involved

22   in any of that?

23   A    No.

24   Q    Okay.  Also, throughout the course of your investigation

25   I know that you testified that my client's role was allegedly

1    to receive the cocaine at the house.  Is there any other
2    information that you have that involves my client with the 320
3    kilos, that he was going to do something else?
4            MS. PROFIT:  Your Honor, this has been asked and
5    answered, asked and answered.
6            THE COURT:  You can answer that if you're able to.
7            THE WITNESS:  Can you repeat your question, sir?
8            MR. FALCON:  Yes.
9    BY MR. FALCON:
10   Q    Aside from the fact that you claim that my client was
11   going to receive the cocaine at the house, correct?
12   A    Okay.
13   Q    Is there anything else, any other evidence that indicates
14   that he was going to do something more dealing with that
15   cocaine?  Was he going to transport it?  Was he going to wrap
16   it?  Was he going to sell it?  Was he going to do anything
17   else?
18   A    I don't have that information, but he's been observed in
19   that same area on numerous occasions via game camera pictures,
20   scouting.  And agents have observed Evaristo Sepulveda walking
21   down in that same area scouting for law enforcement.
22   Q    Okay.  And I think that you testified that Mr. -- Strike
23   that.  I'm sorry.
24           And on the day of the seizure nobody was arrested,
25   correct?

1    A    That's correct.

2             MR. FALCON:  Pass the witness, Your Honor.

3             THE COURT:  Okay.  Thank you.

4             Mr. Ramirez, yes, sir.

5             MR. RAMIREZ:  Thank you.

6             CROSS-EXAMINATION OF CHRISTOPHER DONAHUE

7    BY MR. RAMIREZ:

8    Q    Good morning, Agent Donahue.

9    A    Good morning, sir.

10   Q    Is that correct, Donahue?

11   A    Yes, sir.

12   Q    All right.  My name is Gocha Allen Ramirez and I

13   represent Juan Garcia.  I just have a few questions to ask of

14   you.

15            Just want to be clear on this.  You are not

16   testifying about the seizure of the 320 kilos of cocaine from

17   personal knowledge, are you?  You were not there?

18   A    I was not there, no.  I showed up to the Border Patrol

19   station on that particular day.

20   Q    Right.  But you were not at the location where the

21   cocaine was seized on the day it was seized?

22   A    That's correct.

23   Q    All right.  Are you aware of the fact that there was a

24   high speed chase between law enforcement and the vehicle that

25   was transporting that cocaine?

1    A    Yes, I was.

2    Q    All right.  Are you also aware or can you tell the Court

3    whether or not Juan Garcia was on that property before the

4    high speed chase or did he arrive after the high speed chase?

5    A    The agents that I talked to that were involved in the

6    seizure, when they drove around the property where the seizure

7    happened they didn't particularly observe Juan Garcia there.

8    But during the smuggling event the officer didn't see any

9    other vehicles arrive to the property.  So the agents believe

10   that Juan Garcia was there during the entire smuggling event.

11   Q    All right.  But, so you can't or the -- you can't tell

12   the Court whether Juan -- And by the way, this is -- this

13   property where the cocaine was seized is property that belongs

14   to whom?

15   A    Juan Garcia's father.

16   Q    Okay.  It doesn't belong to Juan Garcia, does it?

17   A    Not that I know of.

18   Q    And there was livestock on the property; is that correct?

19   A    According to the agents, yes.

20   Q    And you have heard testimony when this hearing started

21   from a witness or two that Juan Garcia would take care of that

22   livestock?

23   A    He's told me.  I've talked to Juan Garcia before and he's

24   told me takes care of livestock on the property.

25   Q    All right.  And so you can't tell the Court whether or

1    not Juan Garcia was already on the property taking care of the

2    livestock before the high speed chase or whether he arrived

3    afterwards.  You really don't know, do you?

4            MS. PROFIT:  Your Honor, that's actually been asked

5    and answered.

6            THE COURT:  Okay.  You can answer if you're able.

7            THE WITNESS:  Well, he was obviously there during

8    the smuggling attempt because an agent encountered him --

9    BY MR. RAMIREZ:

10   Q    Right.  But there was a high --

11   A    -- during the chase of the ATV.

12   Q    During the chase of the ATV.  In other words, while the

13   ATV was speeding through that property Juan Garcia was seen.

14   A    Yes.  When agents were -- when the ATV left the property,

15   more agents responded.  Those agents that were responding came

16   from north of the property from Expressway 83.  They didn't

17   observe any other vehicle driving to the property.

18   Q    Okay.  So if Juan Garcia was already on the property --

19   and it wouldn't be unusual for him to be on that property,

20   would it?

21   A    No, he's down there quite often.

22   Q    Okay.  And then there's a high speed chase, that you-all

23   think that he's already there.  Is he involved in that high

24   speed chase in any way?

25   A    Yes, he was approximately five to ten yards from where

1    the ATV turned around.

2    Q    Right.  But was he on the ATV?

3    A    Agents did not observe him on the ATV.

4    Q    Okay.  Did they observe him speak to anyone on the ATV?

5    A    I do not know that.

6    Q    Okay.  Did they ever see the ATV stop near Juan Garcia?

7    A    Yes, it stopped approximately five to ten yards from

8    where he was standing.

9    Q    From where he was standing during the chase?

10   A    Yes.

11   Q    Okay.  And did you see Juan Garcia make any movements

12   towards the ATV?

13   A    I can't testify to that.

14   Q    Okay.  Now is this the time that Juan Garcia had the sack

15   of feed in his hand?

16   A    No.

17   Q    Okay.  When did he have the sack of feed in his hand?

18   A    The agent did not observe him to have anything in his

19   hand.

20   Q    Okay.  When did they observe him with a sack of feed in

21   his hand?

22   A    So when the ATV reached the house the agent observed two

23   subjects get off the ATV.  One of the subjects was Daniel

24   Sepulveda, okay.  Moments later at least three marked U.S.

25   Border Patrol vehicles responded.  Two of those vehicles drove

1   around the property to the south.  The one vehicle drove to
2   the north.  That individual, the agent driving the vehicle to
3   the north then observed your client, Juan Garcia, and Evaristo
4   Sepulveda hastily get into a vehicle and then drive
5   approximately 30 yards away to a barn.  Okay.  He then
6   approached them and encountered both of the subjects.  He
7   observed Evaristo Sepulveda carrying a bag of what appeared to
8   be corn feed.
9   Q    Okay.  And this was after the cocaine had been dropped by
10  the ATV?
11  A    Yes.  One bundle landed approximately five to ten yards
12  from where Juan Garcia was standing.
13  Q    Okay.  Did anybody observe Juan Garcia touch the bundle,
14  grab the bundle, do anything with the bundle?
15  A    The agent observed -- they observed -- because of the
16  fluidity of the situation he observed just movement around the
17  ATV and then he observed moments after agents started coming.
18  The agents believed that the individuals at the house,
19  including your client, Juan Garcia, were notified that law
20  enforcement was coming and that was the reason why they got
21  back in the vehicle.
22  Q    Okay.  Now besides the fact that the ATV was on my
23  client's father's property, did you have any other or do you
24  have any other evidence that Juan Garcia was involved with the
25  320 kilos of cocaine?  Besides the fact that he was on his

1    father's property where the high speed chase took place?

2    A    Yeah.  So through analysis of the conversation on Daniel

3    Sepulveda's phone, your client and Daniel Sepulveda have

4    talked about at least 10 cocaine smuggling events from June to

5    August 2019.

6    Q    Now, but we're talking about 320 kilos here, we're not --

7    have they been charged with other cocaine events?

8    A    Not yet.

9    Q    All right.  I'm talking about the 320-kilo-seizure that

10   we're here on today.  Is there any evidence that you have

11   besides the fact that he was on his father's property where

12   this high speed chase took place that would link him to those

13   320 kilos?

14   A    Not at the moment, but I'm still analyzing stuff.

15   Q    Okay.  Now are you telling the Court that there were

16   horses on this property at the time?

17   A    Yes.  The one Border Patrol agent that encountered Juan

18   Garcia stated he saw at least one horse.

19   Q    Okay.  Did that Border Patrol agent speak to Mr. Garcia?

20   A    Yes.

21   Q    Okay.  And do you know what that conversation entailed?

22   A    He said it was a very short conversation.  He said Juan

23   Garcia and Evaristo Sepulveda appeared frantic and they didn't

24   -- it appeared that they didn't know what they were going to

25   do.  He stated that they appeared to be pretending to feed the

1    horses.  The conversation was extremely short because the
2    agent felt that the other agent that was chasing the ATV was
3    in danger, so he had to abruptly leave Juan Garcia and
4    Evaristo Sepulveda and he had to go respond to the river bank.
5    Q    My question was do you know what that conversation
6    entailed?
7    A    Yes, he did talk to them briefly and they said they were
8    there feeding the horses.
9    Q    Okay.  Now you've said that you also have information
10   regarding Juan Garcia and these other alleged drug offenses
11   through text messages.
12   A    That's correct.
13   Q    Text messages with whom?
14   A    Daniel Sepulveda.
15   Q    Okay.  Can you tell the Court, I mean that was a very
16   vague statement.  Can you tell the Court, give the Court one
17   example of a text message involving Daniel Sepulveda and Juan
18   Garcia in a drug trafficking incident?
19   A    Yes.  So they're talking about receiving tacos and
20   buckets on the river bank.  In our investigation we identified
21   that tacos are code for cocaine and so are buckets.
22   Q    Okay.  And this is a phone that is in Juan Garcia's name?
23   A    No, it was a phone seized from Daniel Sepulveda.
24   Q    Okay.
25   A    I don't know who it's hooked back to, but the phone was

1    seized from Daniel Sepulveda.

2    Q    Okay.  So how is it linked to Juan Garcia, that text

3    message?

4    A    Well, the name of the -- the name that the -- Daniel

5    Sepulveda was talking to someone named Juanito, okay?  In

6    those text messaging strings Daniel Sepulveda sends a picture

7    of Juan Garcia.  And also Juan Garcia sends his address, which

8    is 207 Thornwood Loop, to Daniel Sepulveda.

9    Q    Okay.  But the stream involves a picture, you say was a

10   picture of Juan Garcia in the stream and there's an address on

11   the stream?

12   A    Yes.

13   Q    Okay.

14   A    During the conversation.  Yeah, during the length of the

15   conversation, which is several months.  Yes.

16   Q    Right.  But there's not anything to link the phone number

17   to Juan Garcia, is there?

18   A    I don't know.

19        MS. PROFIT:  Your Honor, this is getting into

20   discovery.  I mean this is just going very broad.

21        THE COURT:  Okay.  No, that was -- I mean that was

22   okay since you brought out that there were a number of these

23   text messages that were -- but I don't think we need to go any

24   further.  I mean it's clear the nature of that.  So.

25        MR. RAMIREZ:  I don't intend to, Judge.

1          THE COURT:  Yes, sir.

2   BY MR. RAMIREZ:

3   Q    Now then you -- I think you discussed some -- there was

4   some discussion of somebody shooting out cameras that DEA had

5   set up on Midway Road; is that correct?

6   A    That's correct.

7   Q    Okay.  And you never did mention -- my client was not

8   involved in that as far as you know?

9   A    As far as I know now, no.

10  Q    Okay.  And you also told the Court that you interviewed

11  Juan Garcia's father after this incident.  I think the day

12  after?

13  A    Correct.

14  Q    And you found it odd that he was not able to give you

15  Juan Garcia's address.

16  A    Correct.

17  Q    Okay.  But you didn't ask him if he knew where Juan

18  lived, you asked him for Juan's address, didn't you?

19  A    No, I asked him where he lived and he said he didn't

20  know.

21  Q    He said he didn't know.

22  A    That's correct.

23  Q    Okay.

24  A    So I mean if you don't know where someone lives I'm

25  assuming you don't know their address.

1    Q    Right.  And were you aware of the fact that Juan had just

2    moved to a new location with his girlfriend at the time?

3    A    No, I'm not aware of that.

4    Q    Okay.  Now I think you also discussed, and this is also

5    not something that Juan is charged with, but the fact that

6    aliens had been discovered on his father's property?

7    A    Correct.

8    Q    Okay.  Do you have any evidence that Juan Garcia was

9    involved in the smuggling of those aliens?

10   A    Well, an ATV left the property -- remained on the

11   property, but an ATV left an area where he was standing then

12   returned to an area where he was encountered.  And then there

13   was foot sign next to the ATV, which are footprints matching

14   one of -- it was actually matching Rene Sepulveda which is the

15   brother of Evaristo Sepulveda and Daniel Sepulveda.  He's one

16   of the younger brothers and has been identified as an

17   acquaintance of Juan Garcia.  That foot sign was next to that

18   ATV which indicated to agents that that person was on that

19   ATV.  That ATV also traveled to the river.

20   Q    Was the foot sign Juan Garcia's foot sign?

21   A    It did not match Juan Garcia's foot sign, no.

22   Q    Okay.  My question was do you have any evidence that Juan

23   Garcia was involved with the smuggling or the hiding of the

24   aliens?

25            MS. PROFIT:  Your Honor, I think that the agent

1    should be allowed to finish his discourse.  He as attempting

2    to answer the question.

3            MR. RAMIREZ:  Well, that's the problem, Judge, is

4    that --

5            MS. PROFIT:  And he might not have liked the answer

6    he was getting, but --

7            MR. RAMIREZ:  It is a discourse and we're supposed

8    to do a question and answer.

9            THE COURT:  And, Special Agent Donahue, can you

10   answer the last question?

11           THE WITNESS:  Yes.  So on that occasion no one was

12   arrested.  Juan Garcia was not arrested.  However, five

13   illegal aliens and an additional two illegal aliens were

14   located in and around the barn approximately 30, 40 yards away

15   from where your client was standing.  I would find that

16   extremely odd that if you're on someone's property you don't

17   know that these people are 40 yards away from you.

18   Q    Is that Juan Garcia's property?

19   A    That's his father's property, mm-hm.

20   Q    Right, so it's not his property, is it?

21   A    But he's down there.

22   Q    Right.  He's on his father's property where he goes

23   almost --

24           MS. PROFIT:  Your Honor, this is kind of

25   argumentative.

1                  THE COURT:  Okay.  Right.  And you can just make

2        that argument later, Mr. Ramirez.

3                  MR. RAMIREZ:  Yes.  All right.

4                  THE COURT:  You don't need to go back and forth with

5        the agent on that part.  I mean, obviously, that's -- you know

6        what he's basing it on and...

7                  MR. RAMIREZ:  All right.

8        BY MR. RAMIREZ:

9        Q    Now let me ask you about this disappearance of this Mr.

10       Sepulveda.  You don't have any concrete evidence that Juan

11       Garcia was involved in that disappearance, do you?

12       A    Not yet, no.

13       Q    Okay.  The bulk seizure of over $1.4 million, you don't

14       have any evidence that Mr. Garcia was involved with any of

15       that, do you?

16       A    I do not.

17       Q    Okay.  You didn't find any *corridos* on Mr. Garcia's phone

18       or you haven't found any *corridos* written about him, have you?

19       A    I have not yet.

20       Q    Okay.  Did you seize Mr. Garcia's phones when he was

21       arrested?

22       A    I believe there was approximately nine phones seized from

23       Juan Garcia's residence.

24       Q    Okay.  And he lives with his wife.  Some of those phones

25       belonged to his wife, did they not?

1    A    I believe it was his girlfriend.

2    Q    His girlfriend?

3    A    Yes.

4    Q    Okay.  And did you find any pictures of drugs on those

5    phones?

6    A    I have not.  I haven't gone through those phones yet.

7    Q    Have you found -- Oh, you haven't gone through the

8    phones.

9    A    No.

10   Q    So you haven't found any pictures of drugs.  Haven't

11   found any violent videos?

12        MS. PROFIT:  Your Honor, asked and answered.  He

13   said he hasn't through the phones.

14        THE COURT:  Right.  I mean that -- it doesn't -- you

15   don't need to ask that since he hasn't gone through them.

16        MR. RAMIREZ:  Okay.

17   BY MR. RAMIREZ:

18   Q    Now was Mr. Garcia cooperative with you when he was

19   arrested?

20   A    Agents stated that he was cooperative.

21   Q    All right.  Are you aware that he's a United States

22   citizen?

23   A    I am aware of that.

24   Q    Okay.  Are you aware of the fact that he has no prior

25   convictions?

1    A    Yes.

2    Q    Okay.  Are you aware of the fact that no drugs were

3    seized from his home?

4    A    I am.

5    Q    Okay.  Were any threats made by Mr. Garcia to any of the

6    agents that arrested him?

7    A    Not that I'm aware of.

8    Q    Okay.  Were there any attempts to flee by Mr. Garcia?

9    A    When he was arrested?

10   Q    Yes.

11   A    No.

12   Q    Okay.  There were no threats made by Mr. Garcia to the

13   agents.  I want to ask you a question though.  Have agents

14   offered people money to testify against Mr. Garcia in Starr

15   County?

16   A    Not that I know of.

17   Q    Okay.  Are you aware of whether or not Mr. Garcia's ex-

18   wife has been offered money to testify against him?

19         MS. PROFIT:  Your Honor, I'm going to object to any

20   line of questioning that identifies any individuals that may

21   or may not be cooperating.  The question was asked if he was

22   aware if anyone was being offered money to testify against Mr.

23   Garcia.  The agent has answered "no" which should encompass

24   the subsequent question.

25         THE COURT:  Right.  Well –

1          MS. PROFIT:  But to the extent we're trying to get

2     into identifying people who may have provided information,

3     we're dealing with an organization that is extremely violent

4     and the Government says that's discovery and it's not here.

5          THE COURT:  Right.  And I do agree that that is

6     really discovery.  And it also would -- you know, we're going

7     to stay far away from anything that might tend to identify

8     anybody that might be cooperating or not cooperating or

9     anything like that.  You know, that type of information, as

10    discovery proceeds, may be appropriate at some point, but now

11    is not the time for that.  So, that is sustained.

12         MR. RAMIREZ:  Okay.

13    BY MR. RAMIREZ:

14    Q    With reference to Mr. Garcia's travels to Mexico did you

15    verify his travels to Mexico?

16    A    Yes, one of my partners did.

17    Q    Okay.  And what did you find?

18    A    Since late October he has entered the United States via

19    Mexico on 10 occasions.

20    Q    Okay.  And would that be unusual in your opinion for a

21    person that lives on border to --

22         MS. PROFIT:  Your Honor, he's asking the agent to

23    speculate.

24         THE COURT:  Okay.  Yeah, I don't think that's

25    necessary.  I mean you can -- it doesn't seem unusual to me,

1    Mr. Ramirez.  That's the type argument you can make.

2              MR. RAMIREZ:  All right.  That's all I have, Judge.

3    I pass the witness.

4              THE COURT:  Ms. Profit, was there...

5              MS. PROFIT:  Yes.

6              REDIRECT EXAMINATION OF CHRISTOPHER DONAHUE

7    BY MS. PROFIT:

8    Q    In terms of a review of Danny Sepulveda's phone did the

9    Government find information that Juan Garcia arranges payments

10   for taxes for Amerigo Garcia's property?  If you know.

11   A    I don't remember that, ma'am.

12   Q    Okay.  Now in terms of Mr. Evaristo Sepulveda there were

13   calls, correct, in terms of his phone where he was discussing

14   the purchase of one kilogram of cocaine, correct?  That was

15   your earlier testimony.

16   A    Yes, there was text messages between Evaristo Sepulveda

17   and another subject discussing the purchase of one kilogram of

18   cocaine.

19   Q    And he did have on his phone the torture videos, correct?

20   A    Correct.

21   Q    Now in terms of -- And at the time of the search warrant

22   that was executed at Juan Garcia's residence there was

23   approximately $11,552 in United States currency that was

24   seized; is that correct?

25   A    That's correct.

CHRISTOPHER DONAHUE - REDIRECT BY MS. PROFIT                    58

1    Q    Now when you talk in terms of --

2             THE COURT:  I'm sorry, I didn't catch that.  Where

3    was the 11,000 found?  At whose....

4             THE WITNESS:  That was found at 207 Thornwood Loop

5    which is the residence of Juan Garcia.

6             THE COURT:  Okay.

7    BY MS. PROFIT:

8    Q    When you talk in terms of taking care of livestock,

9    particularly with respect to the Midway property, in terms of

10   observations by agents, what has the livestock -- what purpose

11   do the agents believe that the livestock satisfies or serves?

12            MR. RAMIREZ:  Your Honor, I'm going to object.  That

13   calls for speculation on the part of the agent.

14            MS. PROFIT:  I think he can explain it enough so

15   that we'll know that it's not -- the timing in terms of the

16   goats, if you would.

17            THE COURT:  Okay.  You can answer if you're able.

18            THE WITNESS:  So the agents, the Border Patrol

19   agents that are frequently doing surveillance in the area of

20   208 Midway Road, they observe days, sometimes weeks that have

21   gone by where the goats have not left the pen that they're

22   kept in.  They observed that pretty much on every single

23   smuggling attempt that happens in the area of Midway Road the

24   goats are released from their pens and individuals are walking

25   with those goats down to the river banks.

1    BY MS. PROFIT:

2    Q    Now in terms of Juan Indalecio Garcia, in terms of the

3    cell phone communications when there was a communication in

4    terms of Daniel Sepulveda and his wife at the time of the

5    seizure, was there any mention made of Juan Garcia at that

6    time in that communication?  And I'm talking about the seizure

7    of the 320 kilograms of cocaine.

8    A    Yes.  So during the text message stream between Daniel

9    Sepulveda and Daniel Sepulveda's wife on January 17th, Daniel

10   Sepulveda's wife states that she's with the subject known as

11   Juanito.

12   Q    And Juanito has been identified during the course of the

13   investigation as who?

14   A    Juan Garcia.

15   Q    And was there any suggestion that she may have picked him

16   up or rescued him, in the string of the conversation?

17   A    Yes.  Based on the conversation it appears that Daniel

18   Sepulveda's wife picked up Juan Garcia.

19   Q    And that was on the day of the smuggling, correct?

20   A    Correct.

21           MS. PROFIT:  No further question.

22           THE COURT:  Okay.  Any followup as to those specific

23   things?

24           MR. D. SANCHEZ:  Yes, Your Honor.

25           THE COURT:  Okay.  Yes, sir.  Just keep it brief if

1    possible.

2              RECROSS-EXAMINATION OF CHRISTOPHER DONAHUE

3    BY D. SANCHEZ:

4    Q    Where did she pick him up?

5    A    I don't know.

6    Q    And this is the same individual that was with Evaristo

7    Sepulveda in the barn?

8    A    Yes, we believe so.  Yes.

9    Q    Did any of the agents ever see her go and pick him up at

10   the barn?

11   A    Well, an agent encountered Juan Garcia and Evaristo

12   Sepulveda at the barn.  Correct.

13   Q    Right.  But did they ever see Daniel Sepulveda's wife go

14   pick him up there at that location?

15   A    Not that I know of.

16   Q    In that conversation you found just mentioned someone

17   named Juanito, but you're not sure who that is?

18   A    I believe it's Juan Garcia.

19   Q    That's your belief, but you're not sure who it is?

20             MS. PROFIT:  Asked and answered.

21             THE COURT:  Right.  I don't think -- that's

22   sustained since --

23             MR. D. SANCHEZ:  Okay.

24   BY D. SANCHEZ:

25   Q    So do you have any independent knowledge or proof that

1    she actually picked up Juan Garcia, the accused in this case,

2    on that day?

3              MS. PROFIT:  That also has been asked and answered.

4              THE COURT:  You can answer if you know.

5              THE WITNESS:  No.

6              MR. D. SANCHEZ:  Pass the witness.

7              MR. FALCON:  May I proceed, Your Honor?

8              THE COURT:  Yes, sir.

9              MR. FALCON:  Briefly.

10             RECROSS-EXAMINATION OF CHRISTOPHER DONAHUE

11   BY MR. FALCON:

12   Q    You talked about the sale of one kilo of cocaine where

13   allegedly my client was involved, correct?

14   A    Yes, it was in the message between Evaristo Sepulveda and

15   this other subject I believe happened on February 4th, which

16   would be one day prior to the search warrant and arrest of

17   Evaristo Sepulveda at his residence.

18   Q    February 4th of this year or last year?

19   A    Yes, February 4, 2020.

20   Q    And of course, that was close to a year after the seizure

21   of the 320 kilos, correct?

22   A    Close to a year, yes.

23   Q    Okay.  You talked about one bundle that was very close to

24   my client.  That bundle was dropped by the ATV, correct?

25             MS. PROFIT:  Your Honor, this is going beyond the

1    scope of redirect.

2              THE COURT:  And I think this is stuff we covered

3    before.  But he can go ahead and answer that if it relates to

4    something that was part of redirect.  I assume it does, Mr.

5    Falco?

6              MR. FALCON:  Yes, Your Honor.

7              THE COURT:  Okay.  You can go ahead, Agent Donahue.

8              THE WITNESS:  Can you repeat the question, sir?

9              MR. FALCON:  Yes.

10   BY MR. FALCON:

11   Q    So you talked about one bundle of cocaine that was maybe

12   five to ten yards from my client at the time that the 320

13   kilos were seized, correct?

14   A    Yes.  That one bundle contained many larger -- many other

15   bundles of cocaine.

16   Q    Yes.  And my question to you, was that bundle dropped by

17   the ATV?

18   A    I'm assuming it fell off the ATV or was removed from the

19   ATV by your client.

20   Q    Nobody saw my client removing that bundle, correct?

21   A    The agents saw a lot.  They saw the two individuals get

22   off the ATV and then they saw other activity around the ATV.

23   Q    But they didn't see my client removing it?

24             MS. PROFIT:  Your Honor, it's been asked and

25   answered several times and it is beyond the scope of redirect.

1              THE COURT:  Right.  Well, I mean the agent could

2     have just said "no."

3              MR. FALCON:  It was just a yes or no, Your Honor.

4              THE COURT:  Right.

5              MR. FALCON:  That's what I'm asking, a yes or a no.

6              THE COURT:  I think the answer is no.  Correct, they

7     saw activity, but not specifically what he was asking.

8              THE WITNESS:  Yes.  So the agent did not observe

9     Evaristo Sepulveda remove a bundle from the ATV.

10             MR. FALCON:  Nothing further, Your Honor.

11             THE COURT:  Okay.

12             MR. RAMIREZ:  Just a couple, Judge.

13             THE COURT:  Yes, sir.

14             RECROSS-EXAMINATION OF CHRISTOPHER DONAHUE

15    BY MR. RAMIREZ:

16    Q    I just wanted to clear up this last statement that you

17    gave Ms. Profit about believing that Juanito -- my -- that

18    Juanito was picked up by Daniel Sepulveda's wife; is that

19    correct?

20    A    Ariana Sepulveda.

21    Q    Okay.  Wasn't your testimony on direct that Juan Garcia

22    drove from one location on the property to another, to the

23    barn after the agents arrived?

24    A    That's correct.

25    Q    All right.  And was that vehicle that he drove in, was

1   that found on the property after the drugs were located?

2   A    I do not know.

3   Q    Okay.  But he had a vehicle, didn't he?  Obviously he was

4   driving one.

5   A    Yeah, he was driving a vehicle.

6   Q    Okay.  Do you know why somebody would need to pick him up

7   then?

8   A    I don't know if he drove from the property or he walked

9   from the property.  But when other agents arrived there they

10  didn't observe him there.

11  Q    Did --

12              MS. PROFIT:  That's been asked and answered, Your

13  Honor.

14              THE COURT:  You can go ahead.

15              MR. RAMIREZ:  Thank you.

16  BY MR. RAMIREZ:

17  Q    What leads you to believe that the Juanito mentioned in

18  that message was Juan Garcia?

19  A    Well, it's also same -- Juanito is the person that Daniel

20  Sepulveda was talking to in various -- in text messages from

21  June through August, talking about the cocaine loads.

22  Q    Well, are you aware of the fact that Daniel Sepulveda has

23  a brother-in-law named Juanito?  Were you aware of that?

24  A    No, I'm not.

25              MR. RAMIREZ:  Okay.  I have no further questions,

1    Your Honor.

2            THE COURT:  Okay.  All right.  I assume that's it.

3    We'll go ahead and -- You can step down, Agent Donahue.  Thank

4    you.

5            THE WITNESS:  Thank you, Judge.

6            THE COURT:  And before we -- So we'll go ahead and

7    hear argument on the issue of bond as to each of the

8    defendants.  Before we do that though I am going to take a

9    recess for a few minutes to give everybody a break for here.

10   So we'll say ten minutes and then we'll pick up again.

11       (Recess taken from 11:32 a.m. to 11:47 a.m.)

12                           AFTER RECESS

13           THE COURT:  Thank you.  Please be seated.  Thank

14   you.

15           Okay.  So we'll go ahead and proceed with any

16   argument with regard to bond.  Again, due to the presumption

17   that applies under federal law the burden of going forward is

18   with the defendant.  And so, go ahead and start with the

19   defendant, each defendant as far as any argument on the issue

20   of bond.

21           And so I'm just pausing because I'm wondering how

22   best to do this.  Should we hear from all three of the defense

23   counsel and then the Government?  Or would you rather respond

24   to each one, Ms. Profit?

25           MS. PROFIT:  I don't think it makes any difference,

1   Your Honor.  I mean I think that each defendant wants to be

2   seen individually.

3           THE COURT:  Yes.

4           MS. PROFIT:  But I also think that each individual,

5   each defendant, while they are viewed individually, also has

6   to be viewed as part of a larger conspiracy and have to be

7   held to the conduct of some of their co-conspirators.

8           THE COURT:  You've convinced me that -- so I think

9   we will proceed just individually.  And starting with Mr.

10  Daniel Sepulveda, Mr. Sanchez.  And since this may take a few

11  minutes we'll just have the defendant can remain there.  And,

12  Mr. Sanchez, did you wish to go ahead with any argument?  And

13  then we'll hear from the Government.  I'll go ahead and rule

14  separately as to each one.

15          MR. D. SANCHEZ:  Yes, Your Honor.  Before I do that

16  though I would like to point out my client has a license to

17  carry a handgun.  It was tendered at pretrial.  It was left

18  out of the report.  And I don't know if we need to make that

19  an offer of proof or if the Court would take notice of that.

20          THE COURT:  Okay.  That's fine.  You mean he has a

21  concealed license or....

22          MR. D. SANCHEZ:  Yes.

23          THE COURT:  Okay.  Yeah, that's fine.  And anyway,

24  apart from that I mean he has the right to -- he's not a

25  convicted felon so he has the right to purchase handguns.  You

1   know, we all do as citizens.  So, you know, that would be --

2   even if he didn't have a concealed license that would be the

3   case.

4           MR. D. SANCHEZ:  Thank you, Your Honor.

5           May it please the Court.

6           THE COURT:  Yes, sir.

7           MR. D. SANCHEZ:  Your Honor, I ask the Court to take

8   judicial notice of the report by the pretrial release --

9   Probation Office of the pretrial release report.  And ask the

10  Court to consider the burden of proof here is clear and

11  convincing evidence that there's no combination of conditions

12  that would reasonably assure the safety of any of the persons

13  or community, or that my client would not appear at his court

14  proceedings.

15          And so, keeping that in mind I'd like to start off

16  with the first factors that the Courts are going to be

17  considered.  The nature and circumstances of the offense

18  charged here.  It's a petition of controlled substance on the

19  river bank where my client was not arrested.  He's allegedly

20  been identified.  Been identified, not by this agent, but

21  supposedly identified by some agents on the day of.  That

22  happened over a year ago.  He had not been arrested until last

23  week.

24          Second to that, the weight of the evidence.  In

25  hearing the testimony of the Government's witness I believe

1    that there are factors here that there's a lot of surmising
2    and a lot of belief that are unsubstantiated.  I believe they
3    have some belief that my client has to do with all kinds of
4    criminal activity, but in reality, Judge, he has no criminal
5    history.  And in this particular case he's got family ties
6    here in the U.S.  His home is here.  He's got a minor child, a
7    five-year-old child.  His wife's a full-time student.  He's
8    full-time employed.  He is the individual who earns the money
9    for the home.  Without him the home falls.

10           The Government, in presenting its evidence and
11   talking about one of the witnesses that allegedly has
12   disappeared, that witness is actually accused.  He's a
13   fugitive from the State and Federal.  And they want the Court
14   to consider that because he's got a minor child he would not
15   run to Mexico, he would not leave, he would not disappear and
16   not be here with his family.  Well, that's what I'm asking you
17   to consider with my client.  Because he's got a five-year-old
18   child, because he has a wife, because he's full-time employed,
19   because he's got the ties to the community he's not going to
20   run to Mexico.

21           People, as you had in this courtroom several times a
22   week throughout this entire year and last year, are trying to
23   get into this country after they've been deported because life
24   in Mexico is not life.  Life south in Mexico is not life.
25   People want to be here even though they've been convicted,

1   even though they've been deported.  They want to be here.  And

2   so, my client has no ties in Mexico.  There's been no evidence

3   that he has ties over there.  The evidence is that he's gone

4   over there for dental visits, but there was nothing ever

5   saying that he has ties or family in Mexico.  And it's

6   reasonable that anyone that lives along the border goes across

7   for medication, for dental, for doctor visits or just to shop.

8       My client also, in reviewing his ties to the

9   community and the fact that he has a license to carry a weapon

10  shows that he does not have any convictions or criminal

11  history.  He's trusted by the State of Texas to carry a

12  weapon.

13      And then the serious and danger to the community and

14  to the agents.  It's -- I find it difficult to believe that as

15  he's locked up facing these charges he's going to be making

16  these threats.  When I asked the agent about the ten people

17  that were over the hill, he himself said "I didn't believe

18  they were there.  I didn't think they existed."  So is that

19  really a threat?  I don't think so.  I think what's happened

20  is they understand that because of the nature of the offense,

21  the amounts involved, that that presumption is there.

22      But speaking of presumptions, in this country we're

23  innocent until proven guilty.  By keeping him locked up it's

24  going to make it more difficult to prepare for trial, Judge.

25  We, as it is on the defense, we can't even enter this building

1    with a cell phone or a computer.  The Government can, their
2    agents can, but we can't.  And so to prepare for trial it's
3    going to be difficult having to go and visit him in a facility
4    that it's difficult to review evidence and go over everything
5    we need to in this case.  And so it almost seems like there's
6    a fundamental unfairness to him.

7            And the fact that he's not ever been convicted, the
8    fact that he has no criminal prior history, the fact that he
9    has strong ties to the community, the fact that the same
10   arguments the Government was using to believe that somehow
11   they made someone disappear, which in no way were they tied --
12   was my client tied to the offense that the individual is
13   accused of.  They want you to make a determination that no
14   matter what, this guy's not safe.  Well, that's not true.

15           You can put him on an ankle monitor.  You can
16   confine him to home, work, meet with his attorney.  You can
17   prohibit his travel to Mexico.  But at the end of the day the
18   same argument that the Government was relying on to say, oh,
19   this person must have been disappeared, is the same argument
20   I'm asking for you to consider that this person is not going
21   to run to Mexico.  Because if he was going to run to Mexico,
22   guess what? he would have done it January of last year and he
23   wouldn't be here today.  He never would have come back if he
24   in fact was the person on the river that was caught.

25           There's a lot of speculation going on in this case.

1    There's a lot of what I would say hearsay that's

2    unsubstantiated.  At trial the rules are a little different.

3    For today we're kind of limited in what we can do to cross

4    examine and call witnesses and really verify was he really

5    seen? could they see how far he was?  Who knows?  You know,

6    they bring evidence saying that my client went to pick up --

7    my client's wife supposedly went to pick up the co-defendant

8    when the co-defendant had his own vehicle there, when there

9    was no need for her to go pick him up.  They put together some

10    conspiracy theories that they believe have to do here so that

11    they can keep him locked up and suppressed and make it

12    difficult to prepare for trial.

13          I'd ask the Court to consider the factors that I've

14    presented before the Court to make a finding that my client is

15    not a danger, that he does have strong enough ties.  And, you

16    know, if the Court were to order him to put up his house as

17    collateral, what would happen to his kids if he were to leave?

18    They'd be without a home.  And no one, I don't think anyone

19    here wants to take their family and raise them in Mexico or

20    somewhere else, not U.S. citizens.

21          So based on that I ask the Court to set a reasonable

22    bond and release my client.

23          THE COURT:  Okay.  Thank you, sir.

24          Ms. Profit, as to Mr. Daniel Sepulveda.

25          MS. PROFIT:  You know, Your Honor, we can talk in

1   terms of the right to have a handgun, but we do not have a
2   right to have a gun and use it to support drug trafficking.
3   And in this instance the individual with the guns, the number
4   of guns that were seized from his house, specifically told the
5   agents that they were lucky because if he had been able to get
6   to his guns he would have killed two of them.  That is not
7   someone that should be allowed free while he is pending trial.
8   Someone who threatens federal agents, someone who brags to
9   federal agents that he has the capacity to kill them should
10  not be free pending trial.

11        This is an individual who thought it would be fun to
12  tell federal agents as they were transporting him to DEA that
13  there were 10 individuals over the hill.  And the agent said,
14  no, we didn't think that there were 10 individuals over the
15  hill.  But this individual, this Daniel Sepulveda feels that
16  he can brag to federal agents that he has the capacity to
17  call 10 individuals to his side to fight them.  And this is
18  the United States, it is not Mexico.  And we do not allow the
19  cartel to control our streets.  Even the streets of Rio Grande
20  City and even Midway.

21        Now you can say -- you can say that this is an
22  individual that is different because he did not flee to
23  Mexico.  But the evidence is that on January 18th, January
24  17th, on the date of the offense he actually did flee to
25  Mexico.  And this evidence is corroborated by his own text

1    messages to his wife who cares enough about her husband that

2    she took the stand and lied in terms of what was contained in

3    those text messages.  And this is someone that you might say

4    could support him and be a third party custodian?  Part of the

5    problem with this case is that the families turned a blind eye

6    to the activities of these defendants.  And in any many ways

7    were more than acquiescing to the activities of these

8    defendants.

9          The Government believes that the testimony and the

10   evidence against this individual for 320 kilograms of cocaine

11   is very strong.  And that the weight of the evidence is

12   against this defendant.

13         We feel that because he is a U.S. citizen that does

14   not entitle him to bond.  And it does not take away his

15   activities.  And the activities are that he's not only

16   involved with the 320 kilograms of cocaine, but he's involved

17   in other cocaine smuggling attempts that, based upon the

18   information found in his own phone, which is very telling

19   evidence, is information that he -- that would indicate that

20   he's been involved in other successful smuggling attempts.

21         So the Government does not believe that family ties

22   are something that act in this defendant's favor.  Family ties

23   would indicate that his family is very much involved in his

24   narcotic trafficking activities and that his family is also

25   involved in trying to hide those activities.  So we do not

1        believe that there are any condition or combination of

2        conditions that will safeguard the community or keep this

3        individual from fleeing to Mexico.

4                And if you talk in terms of those family ties, his

5        most recent love is someone who actually lives in Mexico, is

6        not entitled to live in the United States, is someone who has

7        a mere visitor's status and who has to go back to Mexico every

8        10 to 15 days just by her own test --

9                MR. D. SANCHEZ:  I'm going to object.  I'm going to

10       object, Your Honor.

11               THE COURT:  That doesn't really --

12               MR. D. SANCHEZ:  There's no evidence to that.

13               MS. PROFIT:  Oh, I'm sorry.  I've got the wrong --

14       excuse me.  I've got the wrong woman.  I'm sorry.  You're

15       right.  I'm sorry.

16               THE COURT:  Yeah.  I was already ignoring that, Mr.

17       Sanchez, so you're fine.

18               MS. PROFIT:  I'm sorry.  I have the wrong woman.  He

19       has the wife who took the stand and lied to support him.

20               So for those reasons we do not believe that this

21       particular defendant, under these circumstances or any other

22       set of circumstances, is -- we think he's a danger to the

23       community and we feel that he's a flight risk and he should be

24       detained.

25               THE COURT:  Thank you.

1          And briefly, Mr. Sanchez, did you wish to reply at

2     all?  I mean you don't need to, but....

3          MR. D. SANCHEZ:  No, Your Honor.  I think the

4     Court's heard enough.

5          THE COURT:  All right.  And so, I'm going to go

6     ahead and just rule so that we can be sure that this is -- we

7     do this separately because really in these situations it is

8     individual determination and I don't want to make it seem like

9     we're kind of lumping everyone together or making some kind of

10    group conclusion.

11         So I'm just going to announce the ruling as to Mr.

12    Daniel Sepulveda.  And on that I'll just start by noting the

13    standard that applies again here.  And I'm required to apply

14    the Federal Bail Reform Act in determining bond as to each of

15    the defendants here that is found under federal law in

16    Title 18 of the United States Code, Section 3142.  And in

17    applying that though Mr. Sanchez said something that was very

18    important.  And that is that his client, Mr. Daniel Sanchez

19    [sic], as well as the other defendants here are presumed to be

20    innocent.  They haven't been convicted of anything at this

21    point.  And so that's a very important overriding

22    consideration in applying the Bail Reform Act.

23         At the same time the Bail Reform Act has been upheld

24    by the Supreme Court of the United States in acknowledging

25    that these factors that the courts are required to take into

1    account that they are not contrary or do not inappropriately,

2    you know, override the presumption of innocence.

3            But, so in applying these factors I note that this

4    is very early in this case as to each of these defendants.

5    Discovery really hasn't begun so that things may look

6    different as to all three of the defendants, and in particular

7    as to Daniel Sepulveda, as the case proceeds.  But I am

8    required to apply these factors as things appear at this

9    moment.

10           The first factor is the nature and circumstances of

11   the offense charged.  That's under Section 3142(g)(1).  And

12   the statute particularly emphasizes or mentions including

13   whether the offense -- and there are several different types

14   of offenses that are mentioned that are particularly serious.

15   And one of those is a controlled substance violation.

16           Here in this case as to Mr. Daniel Sepulveda and as

17   to all the defendants there is very serious federal felony

18   drug offenses being alleged against him and the other

19   defendants.  There are two Counts.  They allege a particular

20   amount.  In Count 2 that's referred to and has been the

21   subject of testimony here, involves 320 kilograms of cocaine.

22           Under federal law and based on the determination by

23   the Congress of the United States cocaine, offenses involving

24   cocaine have very significant penalties attached to them under

25   federal law.  And that was done that way to recognize the harm

1    really that's caused by offenses involving cocaine as harm
2    that's caused by trafficking cocaine at various levels.  You
3    have the harm that's caused to individual people that end up
4    being exposed to the use of cocaine.  Children in schools, and
5    so forth; parents who get hooked on cocaine and don't --
6    aren't able and don't take care of their families; the harm,
7    the violence that occurs in connection with the distribution
8    of cocaine, both at the local level and also by the cartels
9    that's obviously here.  We're well aware of the tremendous
10   violence that's done in connection with cocain trafficking.
11   So these are very serious offenses and they carry very
12   significant penalties as reflecting, you know, the nature of
13   what's going on.
14        The particular allegations here where there's a
15   conspiracy Count that is alleging -- and I guess it refers,
16   since there is a specific date, it refers to a certain, that
17   one transaction that appears to be addressed by the conspiracy
18   Count.  But there's been evidence presented, certainly, that
19   this is way broader than that.  But even if you just limit
20   this to 320 kilograms of cocaine, that's a huge amount of
21   cocaine.  There's a huge amount of harm that would have been
22   caused by that cocaine had it ended up, you know, on streets
23   throughout our country.  So I note those things in the context
24   of the seriousness of the offense.  So, indeed, these are very
25   serious offenses alleged against all the defendants.  So I

1       note that as to the first factor.

2               The weight of the evidence.  As to Mr. Daniel

3       Sepulveda I find that the evidence is significant.  Again,

4       this is very early.  He's presumed innocent.  Things may look

5       different as the case proceeds as, you know, as his attorney

6       has a chance to, you know, look more closely at the evidence.

7       You know, there may be arguments that could be made.  As the

8       case proceeds it may look worse for Mr. Sepulveda, as well, as

9       far as the evidence.  So, again, this is just at this point.

10              But particularly with regard to Mr. Daniel

11      Sepulveda, you know, he was -- the agent, Special Agent

12      Donahue testified that he was observed by an law enforcement

13      officer driving the ATV and actually crossing the river going

14      to Mexico.  There's also text messages that appear consistent

15      also with his involvement with that.  And so that's pretty

16      significant evidence, in addition to the other evidence of his

17      activities, that appear consistent with being involved with

18      ongoing drug trafficking and what's the other side of that,

19      which is money coming back.  Although there's nothing in the

20      indictment here about that, so.

21              So I do find that the weight of the evidence is

22      significant as to Mr. Daniel Sepulveda.

23              The other, next factor under the Bail Reform Act is

24      the history and characteristics of the person.  And here there

25      are positive factors that apply.  I think Mr. Sanchez has made

1    the arguments well as far as the positive circumstances that

2    are present with regard to Daniel Sepulveda.  He is a United

3    States citizen.  He's a lifetime resident of the area.  He has

4    a nice family.  His wife testified.  She's going to college.

5    I think she wants to work in education, if I'm remembering

6    correctly.  And so, you know, and she's obviously very loyal

7    to him.  He's very fortunate.  And so, you know, those are

8    positive circumstances here and also reasons why he would have

9    to remain and to address his case here.  So I note those

10   positive aspects of this.

11        You know one of the considerations in terms of the

12   circumstances of a person would include things like employment

13   and financial ties, economic ties and those types of things.

14   On that Mr. Sepulveda at least reported to be involved in

15   landscaping and earning a substantial income from that.  It's

16   really hard to assess that.

17        You know, to make as much as he's indicating he

18   makes per month in landscaping, you know, a person would have

19   to be doing a lot of, you know, landscaping work and probably

20   not have time for much of anything else other than maybe his

21   family.

22        But, so there's no evidence really about if that's

23   really supported here or is -- that, you know, he's doing work

24   that could generate that type of income.  So it's not

25   something I can really come to any conclusion about.  Of

course, if he was doing landscaping work full-time and that
was really what he was working hard at, then that would be
definitely a good thing.  But it's really difficult to assess
in this circumstance.

Self-employment is a good thing and there's
certainly nothing wrong with that.  It's honorable work to be
self-employed.  But at the same time it's hard to assess that
in a context like this.  You know, unfortunately many people
that are accused of criminal activity, ongoing criminal
activity, claim to be self-employed.  And you know, sometimes
they are and sometimes they aren't as far as that's what
they're really doing.

So another positive factor is the fact that Mr.
Daniel Sepulveda has a limited criminal history.  He doesn't
have any convictions.  That's a significant positive factor.
He's had a couple of charges that have been dismissed or not
pursued.  And so that's a circumstance to take into account.

With regard to firearms, certainly, as I mentioned
already, a person, a citizen of the United States, one of the
rights that we have is to possess firearms.  And so, just the
fact that a person collects firearms or has firearms would not
be a negative circumstance.

The situation becomes different in the context
though of a person who's possessing and collecting firearms,
but then also engaged in criminal activity.  That takes on a

1    whole other type of a circumstance.  And here, of course, that

2    gets to whether or not he actually committed the crimes that

3    are alleged and other crimes that have been discussed here.

4    That gets the ultimate merit.  So if he was involved in this

5    type of drug trafficking and also has these firearms it makes

6    it that much more troubling.  But that's something that kind

7    of relates to the charges itself.

8         I do note as far as the circumstance here where

9    there's evidence that Agent Donahue testified that Mr.

10   Sepulveda swam across the river and was in Mexico for some

11   time, apparently.  And also he did return; he obviously came

12   back at some point and has been here for some time now.

13        As far as the statements that Agent Donahue

14   testified to that Mr. Sepulveda made to agents after being

15   arrested, you know, those are troubling.  I agree with Mr.

16   Sanchez and actually Agent Donahue that as far as the -- it

17   probably wasn't a real threat in terms of that there really

18   were people that were close by that might threaten the agents

19   or be a threat to the agents.  But just the fact of saying

20   that is troubling, frankly, especially in that context.  And,

21   you know, it just -- it's a -- yeah, I'll just leave it at

22   that.  It's just one thing among many different factors here,

23   positive and not so positive.

24        I do want to just go back to the Bail Reform Act.

25   The fourth factor is the nature and seriousness of the danger

1    to any person or the community.

2            And as to Mr. Daniel Sepulveda and as to all the

3    defendants, you know, I'm troubled by the comments he made,

4    but even apart from those, you know, apart from those I'm not

5    aware that -- there's not evidence that, you know, he's been a

6    violent person to other people.  His wife didn't testify to

7    anything like that.  I mean she indicated that he was a good

8    father.  And so, in that sense I don't have a reason to

9    conclude that he would be a danger in terms of physical

10   violence, you know, apart from these statements he made and

11   some of the other circumstances here.

12           But even not considering that, another type of

13   danger that is something that courts have to consider in this

14   circumstance arises from the nature of the charge that's

15   alleged as to each of the three defendants.  As the Fifth

16   Circuit has recognized that the risk of continued narcotics

17   trafficking on bail constitutes a risk to the community and a

18   danger.  And this particular type of allegations that are made

19   against Mr. Daniel Sepulveda and the other defendants here,

20   although the charges relate to a specific event, based on the

21   testimony of Agent Donahue it's being alleged as to all three

22   defendants that they're basically involved in ongoing drug

23   trafficking.  And, you know, that is a considerable danger to

24   the community, not just our local community.  And in fact, in

25   some of these circumstances the communities that are affected

1    are different communities.  You know, maybe the drugs to

2    through our community here, but they end up somewhere else

3    and, you know, the danger to other people in those

4    circumstances are certainly -- is certainly a danger to be

5    considered.

6         In this case you have a situation where allegedly

7    the defendants are involved in a, you know, particular area in

8    facilitating drugs to come into the United States and then

9    money to go out of the United States.  And, you know, it's an

10   area where it appears that there are a number of different

11   family members living in that particular area.  And it's a

12   difficult situation in terms of considering conditions that

13   would reasonably address that kind of risk.  And so, you know,

14   I note that as to that particular factor and the circumstances

15   here.

16        In looking at all the factors as they apply to Mr.

17   Sepulveda I do find that an order of detention should be

18   entered based on the conclusion that the conditions would not

19   reasonably assure the safety of the community.  I've

20   considered specifically whether, you know, some type of

21   condition like monitoring might be appropriate here.  I've

22   concluded that it would not, given just the nature and

23   circumstances of the situation.  That, you know, having Mr.

24   Sepulveda restricted to a particular area would not

25   necessarily and not sufficiently protect the community from

1    the type of activities that are being alleged here and that

2    the evidence tends to support at least at this early stage.

3          Also, in his situation there is some evidence of a

4    risk of flight.  I think the more troubling aspect though is

5    the risk of dangerousness to the community.  And so for that

6    reason I do find --

7          And I should note also that Mr. Sanchez mentioned

8    the standard that applied earlier as far as the evidentiary

9    standard.  He was partly right on that.  So I do find that

10   there's clear and convincing evidence that there are not

11   conditions that would reasonably assure the safety of the

12   community.  The risk of flight is based on the lesser standard

13   of preponderance, but again it's mainly the dangerousness

14   that's a concern at this point.

15         So if things do look different, and this applies to

16   each of the defendants in every case, actually, as the case

17   proceeds if there's new evidence or a change in circumstances

18   that would materially affect the bond determination, Mr.

19   Sepulveda, your attorney can move to reopen the hearing and we

20   could consider that further to determine whether or not the

21   ruling should be changed based on things that may look

22   different perhaps, or new information that might materially

23   affect this ruling.

24         Mr. Sanchez, was there anything else we ought to

25   take up with regard to your client Mr. Daniel Sepulveda?

1          MR. D. SANCHEZ:  Judge, I would make one request.

2    Right now they have him housed in Brooks County and I think

3    they want to keep all of them different facilities, I don't

4    know.  But I would ask that if they could house him in La

5    Villa.  My office is out of Harlingen.  I think the co-

6    defendants' counsel has office in Rio Grande City and maybe

7    McAllen.  But for purposes of being able to meet with him more

8    frequent and preparing for trial I'd ask that he be housed at

9    La Villa instead of Brooks County.

10         MS. PROFIT:  Your Honor, the Government would be

11   opposed to having him housed at La Villa.  We've had several

12   problems with La Villa and I do not think it would be an

13   appropriate designation for this defendant.

14         THE COURT:  Well, the way I'm going to leave it is

15   that I'll just ask the marshals to consider what Mr. Sanchez

16   has said about the convenience as far as Mr. Sepulveda being

17   able to consult with his attorney.  But, ultimately, Mr.

18   Sanchez, I'm going to need to leave it to the discretion of

19   the marshals.

20         We have great difficulty in this area as far as the

21   number of individuals that are in custody and the space that's

22   available at different facilities.  And so, you know, I don't

23   think any of the courts here direct any particular defendant

24   to be kept at any particular facility unless there's maybe a

25   rare exception for some kind of medical situation perhaps.

1    But that's the reason for that, that there are a lot of

2    different considerations.  Security, but also just space and

3    other circumstances.

4            So I'll ask the marshals to take that into account,

5    but at the same time I'm going to ultimately leave it to them

6    as far as, you know, what they need to do in terms of your

7    client and all the other, you know, hundreds of defendants

8    that they have to take care of and make sure are kept

9    appropriately.  So.

10           MR. D. SANCHEZ:  Certainly.  And the only reason I

11   made that request is it is my understanding one of the co-

12   defendants is at La Villa, so if they could just be swapped it

13   would just make it easier, I think, for all parties.  But I

14   understand the Court's position and respectfully agree.

15           THE COURT:  Okay.  Thank you.

16           And so we'll go ahead and can excuse -- we'll leave

17   Mr. Daniel Sepulveda to the marshals and can excuse Mr.

18   Sanchez.

19           MR. D. SANCHEZ:  Thank you, Your Honor.

20           THE COURT:  Yes, sir.

21           All right.  And then as to Mr. Evaristo Sepulveda.

22   Mr. Falcon?

23           MR. FALCON:  May I proceed, Your Honor?

24           THE COURT:  Yes, sir, uh-huh.

25           MR. FALCON:  Thank you.

1           Your Honor, the first thing that we would ask of the
2    Court is for the Court to take notice of the Pretrial Services
3    Report.  And in this case, Your Honor, we believe that there's
4    conditions or combinations of conditions that would assure my
5    client's future appearances and also safeguard the community.

6           As the Court is well aware, this is a presumption
7    case.  And I believe that the presumption is that there is a
8    presumption that my client is going to fly.  It's a flight
9    risk.  And that he is a danger to the community.  But I
10   believe that this presumption has been rebutted today.

11          We would like for the Court to consider several
12   things.  And one of the things that we would like for the
13   Court to consider is the weight of the evidence of the charged
14   offense, Your Honor.  Not necessarily, but all the things that
15   were testified.  But we would like for the Court to focus
16   specifically on the charged offense, which is the possession
17   of the 320 kilos involved in this case.  We would also ask the
18   Court to consider the community ties and family ties to Starr
19   County, his employment history, his lack of criminal history,
20   his role in the offense, Your Honor.  His drug and alcohol, he
21   doesn't have any drug and alcohol abuse problems.  His
22   history, Your Honor, at court appearances.

23          And I would like to touch base now at this time,
24   Your Honor, on the weight of the evidence and the role that is
25   being alleged that my client has in this case.  We believe

1   that the weight of the evidence in this case is very weak,

2   Your Honor, and it's based much on speculation.

3          Now there were 320 kilograms of cocaine that were

4   seized.  And as I mentioned earlier, we're asking that the

5   Court focuses on the charged offense and the possible

6   admissible evidence in this case.

7          Now the offense in this case only involves one

8   transaction, Your Honor.  The transaction that involves the

9   ATV carrying the 320 kilograms of cocaine.  And I believe that

10  the evidence that was testified here today only indicates that

11  my client was found in close proximity to one of the bundles

12  of cocaine.  It was testified, Your Honor, and I asked the

13  witness where that bundle came from and how that bundle came

14  about to be close to my client.  And I believe that the

15  evidence indicated that the ATV was hauling the bundles of

16  cocaine and that one of those bundles of cocaine just dropped

17  off of the ATV.  Now the testimony also indicated that my

18  client on that particular occasion had no dealings with the

19  cocaine, Your Honor.  The only evidence was that he was found

20  close to that particular bundle and that he was with Mr. Juan

21  Garcia feeding some livestock, Your Honor.  There was no

22  fingerprints on this bundles, Your Honor.  And my client was

23  not seen by any of the agents handling any of the bundles

24  anywhere on this occasion, Your Honor.  Now my client also was

25  not the driver of the ATV.  Nobody puts him on the ATV that

had the cocaine, Your Honor.  There were no photographs of him
handling the 320 kilograms of cocaine.

Also there was a lot of testimony of seizure of cell
phones that were retrieved as part of this investigation.  And
I believe that my client's phone was also seized and searched,
Your Honor.  And none of these phones indicate that my client
had any participation in the 320 kilogram transaction of
cocaine.

In addition, some of the other co-defendants gave
statements, Your Honor.  And my client, I want to point out,
that he did not give a statement.  He was cooperative.  He
didn't incriminate himself or say anything that would put him
in possession of the 320 kilos of cocaine, Your Honor.

There were some songs that were mentioned.  My
client has nothing to do with any of those songs or he doesn't
have any songs that were made in his honor.

And during the search of the home there was no large
amounts of money that was found, Your Honor.

In addition, his phone had no conversation dealing
with the cocaine that was seized, Your Honor.

During the apprehension of my client he never made
any threats to the agents or there's no evidence to indicate
that he made any threats to any other third party that may
have been involved in this case.

And I believe also, Your Honor, that the wife

1    testified that he was not a violent person and that she didn't

2    think that he posed a danger to the community.

3         As I mentioned earlier, the only link on this case,

4    Your Honor, is from a cooperating informant.  That cooperating

5    informant allegedly claims that my client was there to receive

6    the cocaine, but my client was not found in possession of any

7    kilograms of cocaine on that particular day, Your Honor.  We

8    don't know how reliable this informant is, Your Honor.  And

9    his information has not been corroborated by any other

10   informant or by any law enforcement agent.  The only

11   information was that apparently he was going to wait for the

12   cocaine at a particular location.  We believe that the

13   evidence based on that is very weak to link my client to

14   possession of the cocaine.

15        And in addition, Your Honor, when my client's role

16   is compared to the rest of the defendants, the co-defendants,

17   his role is very minimal, if any.  Even if we were to assume

18   that all of the evidence that was submitted by the Government

19   today is true, his role would be a very minimal role, Your

20   Honor, in this participation.

21        I want to point out, Your Honor, the Court has the

22   Pretrial Services Report in front of him.  And it's got a list

23   of I believe detentions that my client has.  But I want to

24   point out that the first arrest that he had in 2005, Your

25   Honor, he was placed on deferred probation, but he was not

1    convicted of that offense.  And in fact, I believe that it was

2    dismissed in 2011, Your Honor.  The only conviction that my

3    client has is a misdemeanor possession of marijuana, Your

4    Honor.  And there were some other cases that were dismissed.

5    So the only conviction that my client has at this time, Your

6    Honor, is a conviction of a misdemeanor possession of

7    marijuana.

8         Your Honor, and my client has very strong community

9    ties and family ties to Starr County particularly.  My client

10   is a U.S. citizen.  He's 35 years old.  Throughout his whole

11   life he's lived in Starr County.  He owns property in Starr

12   County, he owns a home and he resides in that particular home

13   with his family, which is a wife and two children.  He's been

14   married for more than eight years.  His children have -- seven

15   and four years old.  All of them are U.S. citizens.

16        My client does not have a passport, Your Honor.  And

17   the testimony when it comes to dealings with Mexico is that

18   the only reason that he would go to Mexico is for a dental

19   appointment.  He does not own any businesses in Mexico.  He

20   does not own any property in Mexico.  And he does not have any

21   family members in Mexico.  So the only link to Mexico was for

22   a doctors and dentist appointment.

23        My client has substantial assets in the United

24   States, Your Honor.  And as the report indicates, that he's

25   got about $286,000 of assets in Starr County.

1          His employment history, Your Honor, indicates that

2     he's been employed throughout most of his adulthood.  He has

3     been a pipeliner for at least eight to nine years and he has

4     been making a good income on that.  After he got laid off,

5     Your Honor, he started doing some landscaping work.

6          Currently my client does not have a substance abuse,

7     Your Honor, and he does not have any mental issues that would

8     present a danger to anybody in the community.  His wife

9     testified he's not a violent person, he's a very calm person.

10    The agents also testified that he did not make any threats or

11    was violent to them.  So we believe that he is not a danger to

12    the community, Your Honor.  He doesn't have any criminal

13    history that shows that he's a violent person.  And we believe

14    that based on all this, Your Honor, there's conditions or a

15    combination of conditions that would assure my client's future

16    appearances in court.  And, therefore, we're asking that the

17    Court sets a reasonable bond in this case.

18          Thank you.

19          THE COURT:  Thank you, sir.

20          And, Ms. Profit, as to Mr. Evaristo Sepulveda?

21          MS. PROFIT:  Your Honor, the Government believes

22    that there are no conditions or combination of conditions that

23    will protect the community or ensure the safety of the

24    community.  Or we also do believe that based on the nature of

25    the charges that this individual is a flight risk.

1          With respect to this individual I think that when we

2     talk in terms of the evidence we talk in terms of the search

3     of his phone most recently.  We discovered in that phone that

4     he was engaged in February of 2020 with another individual

5     discussing the purchase of one kilogram of cocaine.  And there

6     was a picture of one kilogram of cocaine that was observed or

7     seen on his phone.  So that was just days before his arrest.

8     In addition to that the search of his phone revealed numerous

9     pictures of bulk quantities of marijuana and bulk quantities

10    of money, which is suspected to be drug proceeds.  So the

11    activity of this particular defendant would also appear to be

12    ongoing in terms of his drug trafficking.

13         Now in addition to that, during the execution of the

14    search warrant at his residence the Government seized 39.7

15    grams of cocaine, 207.8 grams of marijuana, and one gun, which

16    this gun was found in close proximity to the narcotics which

17    were found in the laundry room of his home.  Now his wife

18    denied any knowledge of these, of the cocaine or the gun or

19    the quantity of narcotics that were consistent with street

20    level narcotic dealing.  But nonetheless, the presence of the

21    gun in close relationship, in close proximity to the marijuana

22    and the cocaine is indicative of a danger to the community

23    that is found in drug trafficking, even in the sale of street

24    level quantities of narcotics.

25         Obviously we disagree with the defense attorney in

1    terms of the weight of the evidence against this particular

2    defendant.  We find that there are percipient witnesses who

3    noticed that one of the bundles of marijuana that had fallen

4    from the ATV was within five to ten feet, I think it was, of

5    the defendant.  That after that when they saw law enforcement

6    he and Juan Indalecio Garcia got into the car, they drove down

7    to where the barn was and they attempted to appear to attempt

8    to like they were feeding a horse with a bag of corn.  But at

9    any rate, and the agent testified, the agent who saw them at

10   the time and who was a percipient witness testified that they

11   seemed to be decidedly unnerved.  Obviously, if 320 kilograms

12   of cocaine is rushing in your direction and one of them fall

13   off and you see that there's agents in hot pursuit you're

14   going to be consistently disturbed and not happy about the

15   situation.  There also is evidence, as the agent testified, to

16   the fact that 32 Midway or the place of the location which

17   would be a place that they described as his father's residence

18   is a residence that has been of interest to federal law

19   enforcement in the past.

20           THE COURT:  Whose father lives there?  I'm getting

21   con --

22           MS. PROFIT:  I mean, excuse me.  I'm thinking -- No,

23   excuse me, it's Juan Indalecio Garcia's father who lives

24   there.  And this is Evaristo Sepulveda.

25           So at any rate, it's a property that is known to --

1     is a property that has been searched before by law
2     enforcement.
3              MR. RAMIREZ:  Your Honor, I'm going to object to
4     that argument because there was no evidence submitted to the
5     Court or testified to by any witness that that property had
6     been searched before or was the subject of any narcotics
7     investigations.
8              MS. PROFIT:  Yes, there was testimony with respect
9     to that.  In fact there was testimony that they had retrieved,
10    I think it was in a bulk cash smuggling attempt that they had
11    actually retrieved several cell phones and other items from
12    that particular property.  It is an area that is known to law
13    enforcement and I believe that there was testimony as to that.
14    But there was testimony earlier --
15             THE COURT:  I'm getting confused.  So was the
16    seizure of the cocaine, was that at 32 Midway or 208 Midway?
17    I'm forgetting.
18             MS. PROFIT:  It's 208 Midway.  Okay.  That's 208
19    Midway.  I'm confused.
20             But at any rate it is on Midway, which is an area of
21    high interest to law enforcement because it's used for
22    smuggling both narcotics and monies, bulk cash currencies.
23             But at any rate the fact is that the evidence
24    against these individuals is -- or against Evaristo Sepulveda
25    is very, very strong.  The fact that he was there in order to

1       receive them, corroborated by, I believe, a confidential

2       source.  You also have the presence of law enforcement and

3       their observations of them in close proximity to the bundle of

4       cocaine and you have the cocaine that ultimately was seized

5       and retrieved from the river.

6               So we believe that the evidence against Evaristo

7       Sepulveda is strong.  We believe that there's evidence that is

8       very strong in terms of his phone, his own phone, of current

9       activities or involvement in narcotic trafficking.  We also

10      had pictures of law enforcement helicopters and law

11      enforcement activity indicative of scouting or confirming the

12      scouting activities of Evaristo Sepulveda that was retrieved

13      from his phone.  And we also have the torture videos, which I

14      mean while he doesn't have his own particular *corrido* he does

15      seem to find -- he does seem to save to his phone videos of

16      cartel videos of individuals being tortured by the cartel.

17      Which is kind of troubling and certainly -- I mean we talk in

18      terms of his mental health, I would have to question that of

19      someone that would want to have those kinds of videos on his

20      phone.

21              So we believe that the evidence is strong as to this

22      individual.  We believe that this individual, because of his

23      drug trafficking activity and the period of time that he's

24      been involved in these drug trafficking activities, is a

25      danger to the community.  We feel that this evidence is

1    solidified by the fact that he has a gun in close proximity to

2    street quantity dealings of narcotics in his very own home and

3    residence.  And we believe for these reasons that he should be

4    detained.

5              THE COURT:  Okay.  And, Mr. Falcon, did you wish to

6    have any brief response.  You don't need to say anything,

7    but....

8              MR. FALCON:  Yes, Your Honor.  Again I come back to

9    the same -- to the same issue, Your Honor, that I have is that

10   the Court should focus on the nature or the facts of the case

11   at hand.  There's a lot of things that happened throughout

12   this investigation, Your Honor.  There's videos, there's phone

13   calls, there's thing like that, but nothing concrete that

14   clearly links my client to the cocaine on that day.  And

15   that's my argument, Your Honor.  The only argument is that

16   there's only one witness who has not been corroborated that

17   indicates that my client was going to be receiving the

18   cocaine.  And I think that the Government agrees with me that

19   this particular ATV was rushing through this area, drops one

20   bundle and my client happens to be close by there.  But he was

21   not handling that bundle, Your Honor.

22             So we think that the evidence in this case is

23   circumstantial and weak at best.

24             MS. PROFIT:  Your Honor, we don't agree with him

25   that it was rushing through the area.  We think it was rushing

1    to that area and then went on because of the proximity of the

2    police.  So we would disagree with his characterization.

3              THE COURT:  Okay.  And I'm sure that disagreement

4    will continue for a good while on the various issues in this

5    case.

6              As far as the ruling -- and again, I'm going to

7    address this, the factors that I'm required to consider in the

8    Bail Reform Act as they relate to this particular defendant,

9    Mr. Evaristo Sepulveda.  And I'm required to apply those same

10   factors in determining bond as to him, as well.

11             As to the first factor, and again that's the nature

12   and circumstances of the offense, I won't repeat what I've

13   said as to Mr. Daniel Sepulveda since the nature and

14   circumstances of the offense is really pretty much the same as

15   to all three defendants.  It's a particularly troubling type

16   of offense and conspiracy that's being alleged, given the

17   substance that was involved, given the amount involved in just

18   this one single transaction.  And, obviously, there are

19   allegations that the Government believes this has been going

20   on continuously, but this is just one seizure.  And the harm

21   just from that amount of cocaine is really incalculable, the

22   cost to individual people.  Again, in other places.  So I note

23   that that factor applies basically the same way as to all

24   three defendants.

25             The weight of the evidence.  On that I do agree with

1    Mr. Falcon that the evidence -- I think the weight of the

2    evidence is different as to Mr. Evaristo Sepulveda as compared

3    to Mr. Daniel Sepulveda, for example.  Not that we need to

4    compare the different defendants either.  But I find though

5    that there is significant evidence, but the evidence is not as

6    strong.  I mean there's certainly -- the evidence here,

7    there's evidence I believe that would support a conviction,

8    but it ultimately would be up to, you know, as to all three of

9    the defendants, of course, it would be ultimately up to a jury

10   to determine whether the Government had met its burden.

11          But the circumstances as they relate to -- the

12   evidence as it relates to Mr. Evaristo Sepulveda are more

13   circumstantial in that, you know, he was present at that

14   location where one of the bundles, one of the three bigger

15   bundles was dropped off or the place where I guess all the

16   bundles were headed, you know.  And it's a matter of looking

17   at all those circumstances and a fact-finder saying, you know,

18   is it likely he would have been there with all that going on

19   and not being involved in that situation?  It's possible and

20   it's something that could be argued as the case goes forward.

21   But, you know, generally, of course, people that are involved

22   in large scale drug trafficking are not going to be dropping

23   off bundles next to people who have nothing to do with it, for

24   obvious reasons, or to be in a place where there are other

25   people who have nothing to do with it, for obvious reasons.

1    And the -- you know, his actions after the law enforcement

2    arrive or as law enforcement was arriving, you know, would

3    suggest knowledge of what was going on there in that he and

4    Mr. Garcia left the immediate scene there and, at least

5    according to the agents, then appeared to be trying to -- seem

6    to be feeding a horse, which doesn't appear to be a two person

7    job really.

8            But again, all these things may be challenged.

9    Things may look different as far as those circumstances as the

10    case goes forward, but I'm required to consider the weight of

11    the evidence at this point.  So I would say that, you know,

12    the evidence is not a strong point or is not as strong as to

13    Mr. Evaristo Sepulveda as a factor.  But at the same time, you

14    know, I believe there is significant evidence there from, you

15    know, which the Government could argue.  And, you know, what

16    was seen, combined with at least one informant, as Mr. Falcon

17    pointed out, you know, we don't really know how reliable that

18    person was.  The agent testified that based on other

19    information that that individual provided that that was a

20    reliable informant.  But, obviously, we don't have all that

21    information in front of us.  But, so there was an informant

22    that tended to corroborate what the -- what was seen and the

23    circumstances that were seen.  So, you know, that's

24    significant evidence, but certainly not overwhelming.  So I

25    note those things.

1          The next factor -- the next factor relates to

2     several different things.  The history and characteristics of

3     the person.  And again, I think as to Mr. Evaristo Sepulveda,

4     Mr. Falcon has made a very good argument and pointed out very

5     well some of the positive factors.  And I do agree there are

6     positive factors that relate to his situation.

7          He is a lifetime resident of the area.  He's got

8     very strong ties.  Again, he's a family man.  His wife was

9     loyal and supportive, as in all three.  Our defendants are

10    fortunate that they have very supportive family.  And that's a

11    positive circumstance to be taken into account.  And so I do

12    note that.  His wife, if I -- the Pretrial Report, I believe,

13    indicates that she's a teacher, although I don't remember

14    whether we got into that during her testimony.  But, you know,

15    certainly all those things are a positive situation.

16         As far as Mr. Evaristo Sepulveda's work, you know,

17    in the past he's indicated he worked for the pipeline

18    industry.  I know that's hard work and it also pays well.  You

19    know, the way things turned out I wish he had stayed there and

20    been able to continue that type of work.  He hasn't been

21    working there for at least awhile, apparently.  And for the

22    last year and-a-half or two years or whatever is indicating

23    he's been self-employed.  And again, it's very hard to assess

24    that since many people charged with crimes claim to be self-

25    employed and it's hard to make any determination there.

1          I just note that the assets that Mr. Sepulveda has

2     as reflected by the Pretrial Report, you know, it doesn't seem

3     consistent with -- I mean it looks -- say the pipeline work,

4     for example, I mean that's good, hard work and he earned a

5     good income from that.  But with a family and all the

6     different expenses that go along with that to then accumulate

7     the assets he has.  It appears their residence is paid for,

8     for example, and most people aren't able to do that on a, you

9     know, a normal type of income situation.  So it's a little

10    hard to assess that.  It's positive in the sense that he does

11    have economic ties, but it also raises a little question as

12    well.

13         As far as his criminal history, it's a little more

14    troubling.  He does have that conviction that occurred some

15    years ago, 15 years ago when he was much younger, obviously.

16    But he was deferred probation on a criminal negligent homicide

17    charge.  So, although it may not appear as a conviction at

18    this point, you know, obviously there was a crime that

19    occurred there and that circumstance is troubling.  There was

20    a motion to revoke his probation at some point in connection

21    with that.  It's unclear whether there's any type of adverse

22    ruling on that.  As far as I can tell, Mr. Sepulveda

23    successfully completed his probation.  That's a little

24    unclear.  And I assume his status was somehow he doesn't have

25    to -- due to the deferred probation that at this point he

doesn't have a felony conviction on his record as a result of
the deferred probation, even though he committed a felony
offense.  And I note that that's -- I'm not -- that's
particularly significant since he was in possession of
firearms and, you know, that would be a separate offense
itself if he did have a prior felony conviction that was
considered still a conviction.

So, in any event, since then he's had some other
charges that have -- the more recent ones have been dismissed.
And so his criminal history is a little more troubling, but
not as extensive as some of the cases that we see.

In looking at all the circumstances I'll just note
first and Mr. Falcon mentioned this.  As far as the
presumption I do agree with Mr. Falcon.  I believe that the
evidence tends to rebut the presumption here.  And actually
I'll just note for the Record that I would find that as to Mr.
Daniel Sepulveda, as well, the presumption is not a huge
mountain that defendants have to overcome.  It's an
evidentiary presumption of going forward with evidence.  And
you know, once that -- once there's evidence that would tend
to rebut the presumption, then the burden remains with the
Government in ultimately establishing its request for
detention.

And here though I note as to the presumption that
the presumption reflects a finding of the Congress of the

1    United States that individuals involved in certain types of

2    offenses -- and here the relevant offense is drug trafficking

3    offenses -- that they do represent a risk of flight, of non-

4    appearance, and that they represent a danger to the community.

5    And even where the presumption has been met, as I find it has

6    been here as to Mr. Evaristo Sepulveda, as the Fifth Circuit

7    has mentioned and emphasized, the Fifth Circuit has said in

8    *United States versus Hare*, quote, "Congress intended that the

9    presumption remain in the case as a factor to be considered by

10   the judicial officer."  And specifically, it's a finding by

11   Congress that drug offenders pose a special risk of flight and

12   dangerousness to society.  And that's in the context of the

13   Bail Reform Act, charges that an individual has been involved

14   with that.  So I do find that the presumption has been

15   overcome, but, nevertheless, that factor remains to be

16   considered.  And in this case it's particularly significant.

17          Again, the last factor is the nature and seriousness

18   of the danger.  And I would find as to Mr. Evaristo Sepulveda,

19   again that I don't think there's evidence that he's personally

20   violent or anything like that.  His wife didn't indicate

21   anything like that as far as, you know, the testimony there.

22   He's a good family man and takes care of his family and treats

23   them well, as far as I can tell.  And so, that's certainly a

24   good thing.

25          But another type of danger to the community that the

1   Court has to take into account is the type that's presented by

2   the allegations in this case, and that is the dangerousness

3   that's posed by drug trafficking.  And again, that may be

4   dangerousness that we don't necessarily feel here within the

5   defendant's family or community or -- local community, but

6   rather other places, including other places in the United

7   States, as well as Mexico, for that matter, as far as the

8   effects of drug trafficking and the harm that's caused by it.

9           So on that I note that this is the case, given the

10  allegations, and it is -- you know, is troubling that there

11  was, you know, some drugs and a firearm nearby in Mr.

12  Sepulveda's home at the time of the search here.  And that

13  there's some evidence that the Government has characterized as

14  suggesting that Mr. Sepulveda was involved in a separate more

15  recent transaction involving a much smaller amount of cocaine,

16  that his phone had pictures of marijuana and money on it.

17          The pictures of the cartel violence is troubling,

18  you know.  Most of the time people in the United States can,

19  you know, look at things even though they are shocking to

20  others, but just in the context of, you know, the allegations

21  in this case, you know, to have those types of videos for

22  whatever reason is -- and I'm not suggesting that -- well,

23  I'll just leave it at that.  It's just troubling that those

24  were there.

25          So, again, there are positive factors here and I

1    find it's a closer call with regard to Mr. Evaristo Sepulveda,

2    but I do find ultimately that an order of detention should be

3    entered as to him, as well.  I do find that the conditions

4    that are available would not reasonably assure the safety of

5    the community.  Again, not in the context that he'll be

6    violent toward specific people, but rather the danger of drug

7    trafficking in those circumstances.  I think there's less of a

8    risk of non-appearance in his situation, and so I'm basing it

9    mainly on that one factor as to Mr. Evaristo Sepulveda.

10          So, once again, as to Mr. Evaristo Sepulveda, sir,

11   your attorney would be able to move to reopen the hearing to

12   consider any change in circumstances or other evidence that

13   might affect the Court's ruling here.

14          But other than that, Mr. Falcon, was there anything

15   else we ought to take up with regard to your client?

16          MR. FALCON:  Nothing further, Your Honor.

17          THE COURT:  Okay.  Thank you.  And we'll go ahead

18   and him with the marshals and you can be excused.  Thank you.

19          All right.  And then as to Mr. Garcia, Mr. Ramirez,

20   did you wish to make argument?

21          MR. RAMIREZ:  Yes.  Yes, Your Honor.

22          And, of course, the Court's already noted that the

23   Court's going to consider each and every defendant

24   individually.  And we'd like the Court to do that.

25          And first of all, we'd like to point out that the

1    Government's proffer or testimony to the Court that somehow

2    this incident took place at 208 Midway is wrong.  208 Midway

3    is the address where Mr. Garcia's wife, Prisma (phonetic),

4    lives.  That location is approximately 500 yards from the

5    river from where the cocaine was found.  And that is not the

6    address where this incident took place.  So the Government's

7    wrong about that.

8              My client, Judge --

9              THE COURT:  Where did it occur?  So that one bundle

10   they're talking about, are you thinking that that's at 32

11   Midway?  Is that --

12             MR. RAMIREZ:  Judge, that one bundle was found at

13   the father's -- behind the father's residence.

14             MS. PROFIT:  The agent is saying it's 208 Midway,

15   Your Honor.

16             MR. RAMIREZ:  Well, then it was found on property

17   near the father's location.  I thought it was found on the

18   father's location.

19             THE COURT:  Okay.  So I just -- I mean I think the

20   agent was testifying as to where these things were, and I was

21   trying to keep track of them, but I kind of lost it a little

22   bit when --

23             MS. PROFIT:  Your Honor, it might best be described

24   as a compound, though that will really get everybody upset.

25   But there are some very contiguous properties there.  But my

1    understanding is this incident, and I would say that the one

2    kilogram of cocaine, would have been recovered at 208.  The

3    one kilo that fell off the ATV.

4                    MR. RAMIREZ:  The one bundle.

5                    MS. PROFIT:  Yes, the one bundle.

6                    MR. RAMIREZ:  Right.  And --

7                    MS. PROFIT:  Excuse me, I said one bundle that fell

8    off.

9                    MR. RAMIREZ:  And if the Court would look at the

10   Pretrial Services Report on the assets, the residence at 208

11   Midway is No. 5 on the assets.  That is the home where Mr.

12   Garcia's wife, Prisma (phonetic), lives.  That is a homestead.

13   So I mean I don't know that that makes a big difference.  I

14   don't think it's considered a compound.  I think they are

15   contiguous tracts of property, Your Honor.

16                    MS. PROFIT:  I think that we might think that Prisma

17   Garcia lives at 210, but I'm not 100 percent sure.  I don't

18   know.

19                    THE COURT:  Okay.

20                    MS. PROFIT:  But anyway.

21                    THE COURT:  Yeah, I don't think all that probably is

22   going to --

23                    MR. RAMIREZ:  Right.  Judge, Mr. Garcia is a United

24   States citizen.  Obviously, he has strong ties to the

25   community, he's lived there all his life.  And not only do the

1        ties go back to all of his life, he has strong familial ties

2        going back to his father and grandfather in Starr County.

3        They have ranches that go back generations in Starr County.

4                He has no prior convictions for any kind of felony

5        or misdemeanors.

6                All of his children are United States citizens, all

7        four of them.  He has a home located on Thornberry, I believe,

8        but there's a mortgage on that home.  That home has not been

9        paid off as the other individuals homes has.

10               His father, as I stated earlier, has been a rancher

11       all of his life.  He's been a rancher all of his life.  His

12       income as reported on the Pretrial Services Report is

13       consistent with that income of a rancher with the size of

14       ranches that his father has and that he has.  There's

15       testimony that's been controverted that he also works for his

16       father at his father's ranch.  That was not controverted by

17       the Government.  The income is very consistent with that type

18       of work.  It's not income that is outrageous, but it's income

19       that would be consistent with the type of work and with the

20       assets that he has and the fact that he's paying a mortgage on

21       his home.

22               He supports his children, all four of them.  There's

23       been testimony that not only does he support them, but they

24       are with him on a regular basis which I think sets him apart

25       from some of the other defendants that we see in cases like

1    this.  He continues to pay support in spite of that.  There's

2    been testimony that he is not a risk of flight or a danger to

3    the community, not only by all of the witnesses who testified

4    for him, but by his ex-wife who he's been divorced from for 12

5    years.

6              The items found in his home are not inconsistent

7    with items that could be home in any person's home.  There was

8    no testimony about any drugs found in his home because no

9    drugs were found in his home.  There was testimony that

10   $11,000 was found in his home.  That was actually brought up

11   on the direct examination by his girlfriend and not on direct

12   examination by the agent.  There was no testimony by the

13   Government that that money was somehow wrapped in a manner

14   which would be consistent with drug trafficking, as was stated

15   with the other defendants.  In fact, it's my understanding,

16   Judge, that some of that money was found in his girlfriend's

17   purse.  There's been testimony that that money was to pay

18   taxes which are coming due in the county and school district

19   around this time.  So there's nothing unusual about that.

20             Nothing unusual about the firearms that were found

21   in his home.  There's been testimony that he's collected

22   firearms since before his girlfriend knew him.

23             He has no substance abuse issues, no alcohol issues.

24             All of his assets are in the United States, Your

25   Honor, including his home, his ranch, his father's ranch.  If

1       the Court would remember when Ms. Profit was cross-examining

2       some of my witnesses there were inferences made in her cross-

3       examination that somehow my client had property or businesses

4       in Mexico.  Today we heard no evidence from the Government

5       that would support those inferences that were made on cross-

6       examination.

7              Then we go to the weight of the evidence, Your

8       Honor.  And the cocaine, first of all we have to understand,

9       Your Honor, that my client was in a location where it would be

10      normal for him to be.  He was behind his father's home.  And I

11      would also ask the Court to remember that I think the Court

12      has made reference to one horse.  There was testimony that

13      there are goats back there, that there are steers back there,

14      and that there are horses back there.  So the testimony

15      somehow being narrowed down to one horse is inconsistent with

16      the testimony that was given by witnesses in this hearing,

17      Judge.  Nothing inconsistent or unusual with him being there.

18      Testimony was clear that he goes there on a regular basis to

19      feed the livestock, and not just one horse.

20             The fact that the ATV was going down through the

21      property, it appears towards the river, is not -- his presence

22      at the time close to that area is not unusual.  Now there's

23      been no testimony as to whether or not Mr. Garcia was actually

24      there before the ATV came speeding through the property or

25      after the ATV went speeding to the property.  The fact that he

was in close proximity to one bundle is only circumstantial evidence, Judge. And basically mere presence, obviously the Court is aware that mere presence is not an indication of guilt. There's no evidence that Mr. Garcia was anywhere near the rest of the cocaine. There's no evidence that he had any connection to the cocaine before it was transported. No evidence that he had any connection to the cocaine after it was seized.

Danger to the community. Judge, he's been in the community all of his life. He was not arrested in January of last year when this incident occurred. So, obviously I don't believe the agents would allow a person to remain out for a year in the community if they felt that person was a danger to the community.

My client's cell phones were seized. There's been no testimony from the Government that anything criminal was on those phones. No pictures of drugs, no text messages from my client to any co-defendants. There were no texts, pictures, no *corridos*, nothing on those phones to indicate that my client was involved in drug trafficking or connected to the 320 kilos that were seized in this case.

There was some testimony elicited from the agent regarding text messages. That testimony was very vague in nature, Judge. And it was retrieved from a phone that did not belong to my client. There was nothing that the agent could

1    testify to that would indicate that the text messages somehow

2    were sent to my client.  There was testimony that my client's

3    picture was on one of the text messages.  That's clearly not

4    indicative of him being involved in drug trafficking.

5    Certainly the name Juanito as is referenced in some of these

6    alleged text messages is not an unusual name in this area.

7    And I would submit to the Court that Daniel Sepulveda's

8    brother-in-law is named Juanito.

9         Judge, the Court has already articulated that the

10   Court has to find by clear and convincing evidence that there

11   are no combinations that exist or can be imposed that would,

12   number one, assure his appearance before the Court at future

13   proceedings and protect the community.  Even though Mr. Garcia

14   does have a girlfriend who is a Mexican citizen, I think she

15   was very forthright with the Court when she testified, and I'm

16   hoping that the Court noticed that.  She indicated that she is

17   here legally, that she does have to go back to Mexico on

18   occasion.  But their child is a United States citizen.  She

19   testified that she would be here by his side to go through

20   this trial that he's going to have to go through.  The other

21   witnesses also testified, Judge, that he was the type of

22   person that would confront his problems head-on.  All

23   witnesses testified that they were sure he would appear for

24   trial and that he was not a danger to the community.

25        In addition to that, Judge, there has been testimony

1      that his family owns ranches.  In particular his father owns

2      ranches that are substantial in size in Starr County.  His

3      father is willing to put up that property, as much as the

4      Court wants, to assure his appearance in Court.

5            My client was cooperative when he was arrested.  He

6      didn't threaten the agents.  He's never threatened any agents.

7            So I believe, Judge, that my client stands apart

8      from the other two defendants in this case.  I think that the

9      Court could impose conditions or a combination of conditions,

10     including house arrest, electronic monitoring, that would

11     address the danger to the community that the Court seems very

12     concerned with and should be concerned with, which is drug

13     trafficking.  Clearly, Judge, if the Court imposes those types

14     of conditions of release, putting up a large amount of

15     property, doing electronic monitoring and house arrest,

16     clearly those would address the concerns the Court has with my

17     client somehow -- the concern that he might be involved in

18     drug trafficking and might continue to traffic in drugs.

19           And I would point out to the Court finally, Judge,

20     that the allegations that he somehow has continued to

21     participate in drug trafficking are very vague.  They're not

22     substantiated by any evidence that has been brought to the

23     Court.  Those text messages were not produced to the Court.

24     They have just a name, a nickname on them, and they cannot be

25     linked to my client.  So we're asking the Court to consider my

1    client's situation separate and apart from the other co-

2    defendants.  Consider the fact that there is property that his

3    family can put up.  And also that there are conditions or a

4    combination of conditions that would address both the

5    appearance at future proceedings and the possible danger to

6    the community.

7                THE COURT:  Okay.  Thank you.

8                And, Ms. Profit.

9                MS. PROFIT:  I would suspect that in order to ensure

10   that there is no further drug trafficking in that area that

11   they would have to tender the property at 208 Midway and 32

12   Midway and the other properties owned on the river to the

13   United States so that a Border Patrol station could actually

14   be put there.  But that's not really an issue that's before

15   the Court.

16               The Government believes that Juan Indalecio Garcia

17   should be detained, that he is a danger to the community and

18   we believe that he is also a flight risk.

19               We disagree with the defense characterization of the

20   evidence.  We do believe that his presence on -- it was more

21   than his mere presence on the property.  It was his presence

22   on the property during the attempt to smuggle 320 kilograms of

23   cocaine from Mexico into the United States.  And in fact, the

24   property, he lists 208 Midway, Rio Grande City, which is where

25   the smuggling attempt occurred and where the bundle of

1    marijuana was, as one of his significant assets and

2    liabilities in his -- in the Pretrial Services Report.  So he

3    would list it as an asset.  It's a residence that he owns

4    there.  He's there.

5            I think that it's a mischaracterization of the

6    evidence to suggest that there were other horses there, there

7    were other goats there, there were other cows there.  It is

8    the characterization of the witness that were other animals

9    that live on the property, but at this particular time it was

10    the characterization of the agent or the testimony of the

11    agent that they seemed distressed, frantic even, based upon

12    the ATV, the one bundle of cocaine.  And then they got in the

13    car, they went to the barn, there was one horse there and the

14    two of them appeared to be attempting to feed that one horse.

15    There was testimony from the agent that there are goats on the

16    property, but the purpose of the goats on the property, the

17    agent testified that they spend a lot of time being corralled

18    on the property and that they appear only to be let loose

19    during periods of time, according to Border Patrol agents in

20    their surveillance in the area, when there is going to be a

21    smuggling attempt so that they can kind of help get rid of the

22    sign of the smuggling.

23            So we do believe that the evidence against this

24    defendant is strong with respect to the 320 kilograms of

25    cocaine that was being brought on his property on 208 Midway.

1    And again, I believe that there are other -- there was

2    testimony of the agent that this is a staging area that has

3    been used in the past by the cartel.

4            In addition to that we do have Daniel Sepulveda's

5    phone, which revealed numerous text messaging conversations

6    between Daniel Sepulveda and Juan Garcia.  The agent testified

7    that this was part of a stream of text messages, which for

8    those of us that don't necessarily know much about text

9    messages, you start a stream as a conversation between two

10   individuals.  The conversation continues between these two

11   individuals and that during the course of this conversation

12   there was a happy birthday to Juanito and there was a picture

13   of Juanito that would identify Juanito, based upon the

14   conversations, as the individual that was being referred to.

15           So during this period of time there was the

16   coordination between Daniel Sepulveda and Juan Indalecio

17   Garcia where they were coordinating the crossing of

18   approximately 10 cocaine loads between June 2019 and August

19   2019, which is relatively recent and shows that they have

20   continued to engage in drug trafficking after the lost load in

21   January of 2019.

22           The reason in terms of the defendant being a flight

23   risk is the nature of his relationship with his current love.

24   And I say that because she has no status in the United States.

25   The status that she has or the status she refers to is a

tourist visa.  And this tourist visa does not allow her to
live in the United States.  And in fact she testified fairly
truthfully that in order not to have any difficulties with
Immigration she has to go to Monterrey and has to stay in
Monterrey for 10 or 15 days so that it would appear that she's
actually living in compliance with her tourist visa when she's
not living in compliance with her tourist visa because she's
not here as a tourist.  And in fact she testifies that in her
mind she lives here, but she actually does not have status to
reside in the United States or live in the United States.  She
has status to be in the United States as a tourist.

And so she also maintains a property in Monterrey.
She has, I think, it's a child care center in Monterrey.  So
because of her ties to Mexico it would be very easy for Mr.
Juan Indalecio Garcia to live in Mexico because he has someone
who is established in Mexico and whose family is established
in Mexico.  And we did have some conversation during the
course of his ex-wife's testimony where she did agree that
it's not that difficult for people to travel to Mexico because
people travel to Mexico all the time.  One of his ex-wives
traveled to Mexico here and there for dental things and stuff
like that.  So it's not that difficult to see that Juan
Indalecio Garcia, who's facing 10 years to life on these
charges, for him to simply remove himself to Mexico, be with
the current love of his life and have his children visit him

1      in Camargo.

2              So we do think that he still is a flight risk and he

3      is because of the ties of his current love to Mexico.  And we

4      believe that he continues to be a danger to the community.

5              And when we talk in terms of the incident that

6      happened in July of 2019 we also have to remember then in

7      August of 2019 after search warrants were executed involving

8      the members of this organization, after these search warrants

9      were executed that people were so emboldened in this

10     organization that they were willing to shoot out the cameras

11     from law enforcement.

12             So we do not -- when you talk in terms of drug

13     trafficking, when you talk in terms of the danger to the

14     community, these individuals have taken aggressive steps to

15     harm investigations and to harm law enforcement so that

16     they're willing to shoot out their cameras.  And we don't

17     think that that can be forgiven in the context of this

18     individual or any of the other two individuals.

19             So for these reasons we believe that there are no

20     conditions or combinations of conditions which safeguard the

21     community.

22             THE COURT:  And, Ms. Profit, I did say before and I

23     want to be careful what I take into account for purposes of

24     the ruling on Mr. Juan Garcia, the issue of his bond.  I

25     mentioned that I've read lots of other things in connection

1        with other applications or things that are under seal that

2        would not be appropriate to take into account.  And so I can't

3        remember now whether Agent Donahue testified in this hearing

4        as to what I'm about to ask about or whether maybe it was even

5        in reference to someone else.  But was there testimony that

6        cooperating individuals, more than one, has indicated that Mr.

7        Garcia is one of the people that plays a leading role on this

8        -- this organization on this side of the United States?  Is

9        that something that's been presented here?

10              MS. PROFIT:  Yes, I think it was presented here.

11       Yes, that he's one of the leading -- that he is one of the

12       members of --

13              THE COURT:  But that there were multiple people that

14       have given the Government information to that effect?  Is that

15       something that was testified to, or am I mistaken?

16              MS. PROFIT:  I don't know, I mean I -- I don't know

17       if we actually testified to the fact that there were multiple

18       individuals.  I think that there was testimony to the fact in

19       terms of the weight of the evidence that there were multiple

20       individuals.  But I'm not sure if we actually went into the

21       fact that he was one of the individuals that is considered to

22       be one of the leaders of the organization.  But he is one of

23       the individuals to be considered one of the leaders.

24              THE COURT:  Okay.  Well, so I guess what you're

25       saying is we didn't hear much –

1            MS. PROFIT:  No, I'm not sure that we heard it
2      today.
3            THE COURT:  -- much about that.  So that's something
4      I'm not --
5            MR. RAMIREZ:  Judge, my memory is getting bad as I
6      get older, but I don't remember --
7            THE COURT:  Mine too.
8            MR. RAMIREZ:  I don't remember the agent testifying
9      to any --
10            MS. PROFIT:  I'm older than you are.
11         (Chuckling in courtroom)
12            MR. RAMIREZ:  So that gives me the advantage here,
13      Judge.
14            I don't remember any of the -- the agent testifying
15      that he was a leader of the organization here this morning.
16      And I don't remember any kind of testimony to that effect.  In
17      fact I don't remember any evidence that there was a happy
18      birthday greeting on a text message in a phone.  I remember
19      testimony that there was a picture of Mr. Garcia, but not a
20      happy birthday message.
21            MS. PROFIT:  Well, there was a -- there was a
22      picture of Mr. Garcia.  I think that I -- I think that there
23      was testimony with respect to the fact that there was a
24      picture of Mr. Garcia.  I think if we were to explore the
25      context it would have been a birthday greeting, which I would

1    know from prior conversations.  But at any rate, there was a

2    picture of Mr. Garcia.  There was testimony that there was a

3    picture of Mr. Garcia and that it was part of a stream of

4    conversation with Daniel Sepulveda.  And that was in response

5    to how he would have known that it was Juan Garcia.

6              MR. RAMIREZ:  May I just finish up, Judge?

7              THE COURT:  Yes, sir.  Yes.  Yes.

8              MR. RAMIREZ:  Judge, I just don't understand the

9    conclusion that the Government is reaching based on the

10   testimony that we've heard that Mr. Garcia was on the other

11   end of the line with these text messages.  From what I

12   remember the only evidence presented to the Court that Mr.

13   Garcia might have been on the other end of the line of these

14   text messages was the fact that his picture was sent and the

15   fact that the name Juanito was in the text messages.  But

16   there's been testimony that he was not connected by number to

17   that phone.  And there's no other evidence to connect him to

18   that phone.

19         And, Judge, just to address a couple of the other

20   issues that I think the Government obviously tries to -- as do

21   defense attorneys to influence the Court to rule in their --

22   their way, Judge.  But this testimony about his first ex-wife,

23   well, he only has one ex-wife.  And this constant statement of

24   his new girlfriend or his new love of his life, those are only

25   inflammatory statements trying to prejudice the defendant.

1    Ms. Profit is actually telling the Court where he's going to

2    go live, he's going to go live in Camargo.  I have no idea how

3    she knows that.

4           MS. PROFIT:  I didn't say he could live in Camargo.

5    I said it was easy to visit Camargo.  And it's very difficult

6    to figure out --

7           THE COURT:  Okay.  Ms. Profit, you can come -- let's

8    not interrupt Mr. Ramirez.

9           You can go ahead, sir.

10          MR. RAMIREZ:  And the last point I wanted to make,

11   Judge, was that there's been testimony from the agent that he

12   appeared to be frantic after he saw either the cocaine or the

13   agent or the agents and the cocaine.  Well, Judge, who

14   wouldn't be frantic if they saw an ATV on their property

15   dropping bundles and law enforcement following behind?  I mean

16   I think it cuts both ways in this case.  You don't have to be

17   involved in the actual distribution of the cocaine to become

18   frantic when you see that happening on your father's property.

19   So that's my response to that argument, Your Honor.

20          MS. PROFIT:  Your Honor, for purposes of identifying

21   the third woman in his life as the love of his life, it is

22   very difficult to figure out how to characterize her.  He has

23   one ex-wife –

24          THE COURT:  I think we can leave that alone.  I

25   think I got the picture there.

1          MS. PROFIT:  Well, I just don't like the idea that

2     I'm trying to somehow or another -- I mean I don't know –

3          THE COURT:  No, I thought you restrained yourself on

4     that occasion.  (Chuckling)

5          MS. PROFIT:  Actually, I have.

6          THE COURT:  Okay.  So, again I'll just announce,

7     I'll note for the Record findings as to the factors in the

8     Bail Reform Act as they relate to Mr. Juan Garcia.  And he is

9     certainly in a different -- his situation is different.  The

10    factors apply somewhat differently to him, and so I'll just go

11    through that.

12         Beginning though with the nature and seriousness of

13    the alleged offense, the factor applies I think pretty

14    similarly with him as to that for the reasons that I've

15    already said, that it's a very troubling offense even if it's

16    only limited to 200 and -- I mean 320 kilograms of cocaine,

17    even if limited in that way.  And that's a huge amount of

18    cocaine as far as I've already noted.  And it's a very

19    troubling type of offense that's charged, let alone the

20    allegations that there have been many other such transactions

21    going on.  So that applies basically the same, that particular

22    factor does support the Government's request for detention.

23         The weight of the evidence.  And so I think some of

24    the points Mr. Ramirez made, I think they do reflect correctly

25    that, you know, the evidence may look different as the case

1    proceeds and you can make different arguments.  I understand

2    and appreciate the point he was just making that, you know,

3    someone getting -- someone could be nervous, you know, based

4    on being present at that situation even if they didn't have

5    anything to do with it.  You know, that's a possibility.  But

6    yet when you look at all the circumstantial evidence related

7    to that, I do believe it's pretty suggestive that Mr. Garcia

8    was there for a reason and that that transaction would not

9    happen but for that.

10           As far as, of course, the evidence later, we'll have

11   to sort out how many animals were in the barn.  I was

12   referring to -- I do appreciate, did recall that his common-

13   law wife mentioned that there are multiple animals.  And

14   certainly that's something that I was aware of.  But the agent

15   testified that in that particular barn or enclosure there was

16   one horse.  And, of course, it may turn out that there might

17   be additional animals in that one spot as well.  But all those

18   things can get sorted out.  But the -- you know, the

19   circumstances are suggestive.

20           And so, I note the weight of the evidence is --

21   again, this isn't a factor that strongly supports the

22   Government, but there is significant evidence.  And

23   circumstantial evidence at a trial is treated just like any

24   other evidence.  You know, eye witness evidence.  A jury can

25   consider the circumstances and make factual conclusions based

1      on a set of circumstances that, you know, together suggest a

2      fact.  And so, you know, here there's pretty significant, if

3      circumstantial, evidence with regard to this one event that's

4      the subject of these charges.  But it may come out

5      differently, as well.  And again, it's not a factor that

6      strongly favors the Government.

7              The other, next factor, the nature or the particular

8      characteristics and circumstances of the defendant.  Here as

9      to Mr. Juan Garcia there again are a number of very positive

10     factors and perhaps -- well, I was about to -- I don't want to

11     -- I don't need to compare him with anybody else.  But so I'll

12     just leave it that there are positive factors with his

13     situation.

14             I agree with Mr. Ramirez that I thought it was -- I

15     found that the testimony of his ex-wife was, you know,

16     credible and, you know, left a very favorable impression of

17     Mr. Garcia as far as his taking responsibility for his

18     children and treating his ex-wife appropriately.  And those

19     are things that, unfortunately, many men don't do.  And so,

20     you know, that's a very good thing that suggests that that

21     part of his character is, you know, left me with a favorable

22     impression certainly.  I mean it's probably a little unusual

23     for, you know, a person's ex-wife to give testimony that would

24     be as favorable as that was.  I recognize at the same time of

25     course that, you know, she's getting some support from him and

1    so forth.  But I just was left with the impression that Mr.

2    Garcia is trying to do the right thing as far as taking care

3    of his family.

4            And also his common-law wife, her testimony was

5    impressive as well in terms of, you know, her personal

6    situation.  She seemed to be candid and, you know, reflected

7    also that he takes good care of his children as well as her.

8    And so, those are very positive things in terms of his

9    personal life, as far as I can tell based on that testimony.

10   So that's, you know, a very good situation.

11           Again, Mr. Garcia is fortunate that he has, you

12   know, family that's very supportive of him.  Seems like he has

13   a very nice family.  Not many people, like I said, that could

14   kind of juggle that situation, but he seems to be doing it

15   quite well.  So that's a very positive circumstance.

16           It's also a very positive circumstance in terms of

17   he has no criminal history.  His income and employment, you

18   know, is more -- it's more understandable in terms of

19   consistent, you know, given the property that his family has.

20   You'd expect that to generate a -- you know, a decent income.

21   And certainly ranch work is, you know, is honorable work.  You

22   know, I admire people that are actually doing that, if a

23   person is doing that full-time.  I lived in Wyoming for awhile

24   and knew some people that did ranching and I know they worked

25   very hard.  But, so, if that's, you know, what Mr. Garcia has

1    been doing, then that would be very -- a very good thing.

2           On the other hand, you know, the evidence that's

3    been presented is that he's seen out and about a lot and

4    appearing in these situations where -- or in vehicles that are

5    in situations where these transactions are believed to be

6    going on.  In this one case the one transaction that's the

7    subject of the indictment that he was, you know, there and

8    present near where the drugs were.  So, again, I'll leave that

9    at that.

10          His criminal history is very limited.  He has no

11   convictions at all, has one prior charge that was dismissed.

12          So those are positive circumstances that apply as to

13   Mr. Garcia.

14          I am little bit troubled by the -- you know, he has

15   these very strong family ties.  You know, the testimony

16   concerning his father's response to agents wanting to know --

17   you know, he apparently couldn't tell them either where his

18   son worked or where he lived or what his phone number was.

19   Now, you know, he might have been nervous or whatever, but,

20   you know, it's just not -- that's not a particularly helpful

21   kind of situation there in terms of how the family ties play

22   out in this particular circumstance.  But that's not a big

23   factor, but I just note that.

24          The last factor and really the one that concerns me

25   most as to Mr. Garcia and as to each of these defendants --

1       and I've mentioned this in connection with the other

2       defendants, but it also concerns me most in his situation --

3       is the fourth factor under the Bail Reform Act:  the nature

4       and seriousness of the danger to the community that would be

5       posed.  And here drug trafficking is a very significant

6       danger.

7              There is some evidence that would suggest that Mr.

8       Garcia was involved in ongoing drug trafficking transactions,

9       loads of cocaine.  Of course, the evidence may show otherwise

10      as the case proceeds.  There may be arguments that could be

11      made that, you know, that wasn't him.  But at the same time

12      it's pretty suggestive what the agent testified to that he has

13      a string of texts that included his address and picture.  And

14      in the context it appeared to be the same Juanito.  Of course,

15      Mr. Ramirez is obviously correct that there are likely many

16      Juanitos in the area, including, apparently, one of

17      Sepulveda's cousins.  But that's troubling.

18             And given the nature of this particular area where

19      we have multiple properties that seem to be involved by or

20      owned by or controlled by Mr. Garcia or his family or others

21      that are allegedly involved with this, it makes it

22      particularly difficult to set conditions.  So like, for

23      example, if we set home confinement I realize that Mr. Garcia

24      now resides at a different property that's actually removed

25      from Midway.  But given the types of allegations here in this

1    particular case, I don't think that the conditions that could

2    be set, including monitoring and so forth, could really

3    appropriately address that, the risk that's there.  And,

4    ultimately, although I find the decision even closer as to Mr.

5    Garcia by a good bit closer than, for example, the other

6    defendants here, I do find ultimately that an order of

7    detention should be entered.  I just conclude that based on

8    all the circumstances that the conditions that the Court could

9    set would not reasonably assure the safety of the community.

10   And that's the main part of the ruling, that there's clear and

11   convincing evidence that would suggest that would not be

12   something that could be done at this point.

13        The risk of flight is present.  It's always present,

14   as Congress has found with these types of charges, and

15   especially in this case with the potential penalties that

16   apply as to all the defendants.  It's a factor here.  It's

17   heightened in the sense that, you know, Mr. Garcia has a

18   common-law wife who lives in Mexico.  And so, unlike many

19   people he would have somewhere to go outside the United States

20   and could go there.  At the same time though I -- my ruling

21   really is more on the risk of danger to the community because

22   it just strikes me that Mr. Garcia's ties to his children are

23   such that I think that probably conditions could be set that

24   would -- might be sufficient to address that aspect alone.

25   But ultimately for those reasons I do find an order of

1    detention should be entered.

2              Especially since there are a number of positive

3    factors with Mr. Garcia and the circumstances.  I'll just note

4    again that if there's any additional information, that we

5    could consider some material change in circumstances.  And

6    things may look different as the case proceeds and as

7    discovery proceeds, for example, because some of the

8    conclusions about the potential dangerousness do relate to,

9    you know, what appears to be some of the evidence at this

10   early stage.  And maybe it looks like as things proceed that

11   it maybe looks a good bit different or materially different or

12   there's some aspect of this that, you know, was off as far as

13   the Court's consideration at this point.  And I would be

14   willing to reopen the hearing if there's other -- if there's

15   anything like that.

16             So was there anything else we ought to take up with

17   regard to Mr. Garcia, Mr. Ramirez?

18             MR. RAMIREZ:  No, Your Honor.

19             THE COURT:  Okay.  Thank you.

20             You-all can be excused.

21             I should mention also before Mr. Garcia goes, just

22   that I was also favorably impressed with the testimony of Mr.

23   Salinas.  And Mr. Garcia is lucky, again, he's got very

24   supportive family and people that are related, associated with

25   the family.  And I just wanted to mention that, that I felt

1    that that was also a favorable circumstance.

2            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

3            THE COURT:  Yes, sir.

4        (Proceeding concluded at 1:37 p.m.)

5                        * * * * *

6        *I certify that the foregoing is a correct transcript*

7    *to the best of my ability produced from the electronic sound*

8    *recording of the proceedings in the above-entitled matter.*

9      */S./ MARY D. HENRY*

10   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

11   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

12   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

13   *JTT TRANSCRIPT #62002*

14   *DATE FILED:  MAY 12, 2020*

15

16

17

18

19

20

21

22

23

24

25